# NO. 24-3947

In The

# United States Court Of Appeals

## For The Sixth Circuit

**BRYAN PESTA,**

*Plaintiff - Appellant,*

**v.**

**CLEVELAND STATE UNIVERSITY; CLEVELAND STATE UNIVERSITY BOARD OF TRUSTEES, In their official capacities; LAURA BLOOMBERG, in her individual and official capacity; HARLAN M. SANDS, in his individual capacity; BENJAMIN WARD, in his individual capacity; CHRISTOPHER MALLETT, in his individual capacity; CONOR MCLENNAN, in his individual capacity; WENDY REGOECZI, in her individual capacity,**

*Defendants - Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
AT CLEVELAND

———————

**BRIEF OF APPELLANT**

———————

**Frederick C. Kelly, III**
**LAW OFFICES OF FREDERICK C. KELLY**
**One Harriman Square**
**Goshen, NY 10924**
**(845) 294-7945**

*Counsel for Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure and Sixth Circuit Rule 26.1, counsel for Plaintiff-Appellant certifies that no party to this appeal is a subsidiary or affiliate of a publicly owned corporation and no publicly owned corporation that is not a party to this appeal has a financial interest in the outcome.

## STATEMENT REQUESTING ORAL ARGUMENT

Pursuant to Sixth Circuit Rule 34(a), Appellant requests oral argument. The case involves complex issues regarding the First Amendment, including *Pickering* balancing, and judicial deference to administrative decision-making against what, especially at first blush, appears to be a complex factual background.

For example, the Court will have to wade through an administrative record replete with arcane references to NIH DUCs or "data use certifications," which are distinct from, but related to DARs or "data access requests" – but which are in fact the same thing as "data use agreements" or "dua/DUAs." Then, too, the Court may have to keep track of a First Request, a Second Request, and Third Request for NIH restricted access data, and keep these aligned with "project #18007," "project #19090," and "project #19747"; and bear in mind that a "Requester" under the NIH regulations is actually the university itself, not the individual professor requesting data for a study. (These are only some of the minutia to comprehend.)

The record was misstated and mis-cited a number of times before the trial court (which refused to grant oral argument), and it is important that this Court not be misled.

# TABLE OF CONTENTS

**Page:**

CORPORATE DISCLOSURE STATEMENT ............................................................i

STATEMENT REQUESTING ORAL ARGUMENT ............................................. ii

TABLE OF CONTENTS ......................................................................... iii

TABLE OF AUTHORITIES......................................................................v

I.     STATEMENT OF JURISDICTION ...............................................1

II.    STATEMENT OF THE ISSUES FOR REVIEW............................1

III.   INTRODUCTION ........................................................................2

IV.    STATEMENT OF CASE ..............................................................7

V.     SUMMARY OF THE ARGUMENT.............................................32

VI.    ARGUMENT................................................................................33

       STANDARD OF REVIEW ..........................................................33

       DISCUSSION...............................................................................34

              I.     THE DISTRICT COURT ERRED BY INVOKING
                     *GARCETTI*, RATHER THAN *PICKERING* TO WEIGH
                     SPEECH BY A PUBLIC UNIVERSITY PROFESSOR
                     ON MATTERS OF PUBLIC CONCERN ................................34

              II.    THE DISTRICT COURT FAILED TO CONDUCT ITS
                     OWN REVIEW OF THE DEEPLY FLAWED
                     ADMINISTRATIVE RECORD COMPILED BY
                     APPELLEES ...........................................................................37

III.    THERE IS NO EVIDENCE, INCLUDING THE
        AFTER-ACQUIRED EVIDENCE, THAT
        DEMONSTRATES THAT A REASONABLE FACT-
        FINDER WOULD HAVE REACHED THE SAME
        CONCLUSION AND INVESTIGATED AND THEN
        TERMINATED PESTA ............................................................52

IV.     PESTA WAS ENTITLED TO SUMMARY JUDGMENT
        IN LIGHT OF APPELLEES' CONCESSIONS AND
        THE DECLARATORY CAUSE OF ACTION  SHOULD
        BE  REINSTATED....................................................................53

VII.  CONCLUSION..................................................................................54

CERTIFICATE OF COMPLIANCE.......................................................56

CERTIFICATE OF FILING AND SERVICE .........................................57

ADDENDUM ........................................................................................58

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
    626 F.3d 699 (2d Cir. 2010)............................................................42

*Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cnty.*,
    39 F.4th 95 (3d Cir. 2022)..............................................................35

*Bible Believers v. Wayne Cnty*,
    805 F.3d 228 (6th Cir. 2015)........................................................38

*Bonnell v. Lorenzo*,
    241 F.3d 800 (6th Cir. 2001)........................................................35

*Brown v. Board of Ed.*,
    347 U.S. 483 (1954)....................................................................5, 6

*Cockrel v. Shelby Cnty. School Dist.*,
    270 F.3d 1036 (6th Cir. 2001) ................................................37, 39

*Cox v. Louisiana*,
    379 U.S. 536 (1965)......................................................................38

*Dambrot v. Cent. Mich. Univ.*,
    55 F.3d 1177 (6th Cir. 1995)........................................................35

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006).................................................................*passim*

*Holley v. Seminole County School Dist.*,
    755 F.2d 1492 (11th Cir. 1985) ..............................................37, 39

*In re Fosamax Products Liab. Litig.*,
    707 F.3d 193 (2d Cir. 2013)...................................................... 41-2

*Josephson v. Ganzel*,
    ___ F.4th ____ (6th Cir. 2024)..............................................3, 34

*Levin v. Harleston*,
    770 F. Supp. 895 (S.D.N.Y. 1991) ...................................................35

*Levin v. Harleston*,
    966 F.2d 85 (2d Cir. 1992).............................................................35

*McKennon v. Nashville Banner Pub. Co.*,
    513 U.S. 352 (1995)......................................................................52

*Memoirs v. Massachusetts*,
    383 U.S. 413 (1966).......................................................................6

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021)..................................................*passim*

*Mt. Healthy City Sch. Dist. v. Doyle*,
    429 U.S. 274 (1977)......................................................................33

*Murthy v Missouri*,
    603 U. S. ____ (2024) ...................................................................37

*New York Times v. Sullivan*,
    376 U.S. 254 (1964)................................................................. 34-35

*Pickering v. Board of Education*,
    391 U.S. 563 (1968)................................................................*passim*

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995)......................................................................36

*Snyder v. Phelps*,
    562 U. S. 443 (2011).....................................................................37

*Speech First, Inc. v. Schlissel*,
    939 F.3d 756 (6th Cir. 2019)..........................................................36

*Stout v. Berry Ins. Group*,
    S.D. Ohio No. 1:17-CV-155, 2021 WL 3634711 .........................................52

*United States v. Alvarez*,
    567 U. S. 709 (2012) ....................................................................37

*United States v. Clark*,
    469 F.3d 568 (6th Cir. 2006) .......................................................................40

*United States v. Sandridge*,
    385 F.3d 1032 (6th Cir. 2004) ....................................................................40

*West Virginia State Board of Education v. Barnette*,
    319 U.S. 624 (1943)....................................................................................38

*Wieman v. Updegraff*,
    344 U.S. 183 (1952).......................................................................................7

*Yancey v. Carroll County, Ky.*,
    876 F.2d 1238 (6th Cir. 1989)....................................................................52

**Statutes:**

28 U.S.C. § 1291 ..................................................................................................1

28 U.S.C. § 1331 ..................................................................................................1

42 U.S.C. § 1983 ..................................................................................................1

Ohio Admin. Code § 3344-28-01 et seq ...........................................................23

Ohio Admin. Code § 3344-28-01(A) .................................................................24

**Constitutional Provisions:**

U.S. Const. amend. I ...............................................................................1, 2, 37, 39

U.S. Const. amend. XIV ......................................................................................1

**Rules:**

Fed. R. App. P. 4(a) ............................................................................................1

Fed. R. Civ. P. 56.........................................................................................4, 53

Fed. R. Civ. P. 56(a) ........................................................................................33

Fed. R. Civ. P. 56(c)(1)(A) ...................................................................39

Fed. R. Civ. P. 56(e)(2)........................................................................40

**Regulations:**

45 C.F.R. § 46.102(e)(1) ................................................................13, 45

45 C.F.R. § 46.102(e)(5) .....................................................................45

45 C.F.R. § 46.102(e)(6) .....................................................................45

**Other Authorities:**

CSU Faculty, Staff, and/or Students.
(accessible as of May 28, 2024, at www.csuohio.edu › sprs › irb) ..........................12

Herrnstein and Murray, <u>The Bell Curve: Intelligence and</u>
<u>Class Structure in American Life</u>, Free Press: New York—1994.............................5

Manchester, <u>The Last Lion: Winston Spenser Churchill:</u>
<u>Visions of Glory, 1874-1932</u>, (Bantam Doubleday
Dell Publ Group: New York, 1983) ........................................................ 6-7

Otto Klineberg, <u>Negro Intelligence and Selective Migration</u>
(Columbia University Press: New York, NY) 1935,
*reprinted* Greenwood Press Publ: Westport, CT) 1974 ............................................6

Pesta, "Only in America:
Cold Winters Theory, race, IQ and well-being." 2015 ............................................16

## I.    STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because the claims arise under the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291 because this appeal is from a final judgment entered on October 7, 2024. A timely notice of appeal was filed on October 29, 2024, in compliance with Rule 4(a) of the Federal Rules of Appellate Procedure.

## II.    STATEMENT OF THE ISSUES FOR REVIEW

Whether the district court erred:

- in applying the test from *Garcetti v. Ceballos, 547 U.S. 410 (2006)*, rather than the test from *Pickering v. Board of Education, 391 U.S. 563 (1968)*, in a First Amendment case involving a professor's academic speech on an issue of significant public concern.

- under *Pickering* and *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), by permitting the Appellees to outweigh Appellant's interest in publishing a landmark scientific study.

- by blindly deferring to an administrative record rife with factual errors and evidence of bias in a First Amendment retaliation case.

1

- by ignoring concessions of fact where Appellees failed to respond to Appellants' assertions of fact regarding their motives and erroneous findings.

- by considering after-acquired evidence on the question of liability and then compounding that error by resolving contested facts against Pesta.

- in dismissing Pesta's count for declaratory judgment when the Appellees made no argument against it other than the error that it was wholly derivative of his First Amendment counts.

## III.    INTRODUCTION

This is a First Amendment retaliation case where a professor produced a landmark scientific study on race, intelligence, and genetics which quickly rendered him a target of politically motivated attacks. Far from offering a redoubt against such attacks, the state university welcomed the incursions against free speech as political activists outside the university made common cause with like-minded academics within to impose viewpoint discrimination. The activists raised spurious allegations of research misconduct against the professor, even as they made clear to the university that their purpose was to exploit regulations to punish the professor for his politically explosive conclusions. The university, however, readily fell in line and when regulatory review should have cleared the professor, the university officials simply bent the regulations to their own ends. The result

was a farcical report, allegedly detailing misconduct on the part of the professor, which was then used as a pretext to fire the tenured professor.

The district court passed over admissions and facts established in the professor's favor, clearly misapplying the law in the Sixth Circuit after *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), and generally crafting a decision rife with both legal and factual errors.  Perhaps most obviously, despite being reminded that in this Circuit *Pickering v. Board of Education, 391 U.S. 563 (1968)* applies to a professor's speech on matters of public concern, the district court reached for *Garcetti v. Ceballos, 547 U.S. 410 (2006)* instead – thus ignoring both *Meriwether* and *Josephson v. Ganzel,* _____ F.4th _____ (6th 2024).  In doing so, the lower court spared itself from the need to explain balancing against a professor who had produced a landmark scientific study for the sake of punishing what was, at best, a single *de minimis* technical infraction – an error for which CSU's Office of Research Integrity, not the professor himself, was primarily responsible.

The factual errors were no less egregious.  For example, the lower court reviewed with silence the undisputed evidence showing the CSU Investigative Committee's bias against the professor.  Yet while weighing the research misconduct charges against the professor, even as they assured him that they were not at all concerned with the substance of his research and would not let politics influence their review (*Final Report, RE.38-5, PageID#923*), the Investigative

3

Committee were writing amongst themselves of the need "to more directly address the point about the harm done by his research (without stating it as our opinion)" (*Deposition Exhibit, RE.57-1, PageID#3295*) and of the need to "bolster the point that the subject matter of his research is unethical." *Id. PageID#3294.* Behind the scenes, Appellees McLennan and Regoeczi even expressed frustration that their punitive investigation had not led Professor Pesta to condemn his own research as unethical. *Deposition Exhibit, RE.57-2, PageID#3296 and Transcript, RE.54, PageID##2619-2620.* The evidence of malice was so overwhelming that Appellee Mallett, who sat on the committee, simply admitted under oath that the committee did not proceed against Professor Pesta fairly and impartially. *Transcript, RE.57, PageID##3107-3108.* Still the district court acknowledged none this undisputed material and refused to apply the inferences required by Rule 56. *Cf. Order, RE.73, PageID##3963-3975.*

The district court likewise ignored the considerable evidence that such animus is actually widespread in the academy and has, for decades, been a source of physical threats and other pressures for researchers who fall on the hereditarian side of the heredity vs. environment debate on racial differences. Both Dr. Charles Murray and Dr. Stephen Hsu gave testimony on this point, which the district court failed to register.

Then, too, the district court, like the CSU hierarchy, rubber stamped the flawed administrative findings produced by this biased committee, ignoring uncontradicted evidence of blatant error. So what is really at work here?

Respectfully, we suggest that what is at work is the taboo surrounding race differences. Dr. Charles Murray has observed that:

> …the topic of genes, intelligence, and race in the late twentieth century is like the topic of sex in Victorian England. Publicly, there seems to be nothing to talk about. Privately, people are fascinated by it. As the gulf widens between public discussion and private opinion, confusion and error flourish. As it was true of sex then, so it is true of ethnic differences in intelligence now: Taboos breed not only ignorance but misinformation.
> Herrnstein and Murray, <u>The Bell Curve: Intelligence and Class Structure in American Life,</u> Free Press: New York—1994, p. 297.

Of course, if Dr. Murray's observation were not true, the taboos would not be evident even in some of the Supreme Court's most famous cases. For example, the appellate records in *Brown v. Board of Ed*, 347 US 483 (1954) show that it was no other than Thurgood Marshall's own experts who acknowledged racial differences in intelligence (integration was supposed to erase such differences, but has failed to answer that purpose). Representative quotes from the material Marshall had urged before the Supreme Court in *Brown* would include the following:

> Since the days of the Army intelligence-testing program [*viz.* in World War I] a very large amount of material dealing with the question of Negro intelligence has been collected. The summaries of the results of Garth..., Pinter..., Witty and Lehman... and others make it quite clear that Negroes rank below Whites in almost all studies made with intelligence tests.

> Otto Klineberg, <u>Negro Intelligence and Selective Migration</u> (Columbia University Press: New York, NY) 1935, *reprinted* Greenwood Press Publ: Westport, CT), 1974, p. 9.

And:

> While we have no complete proof that an improvement in their background can bring them up to the White level, we also have no right to conclude the opposite...
> Klineberg, *Id.* p. 59.[1]

But one never sees such passages openly discussed by the Supreme Court (in stark contrast to even the more salacious pornography cases, *e.g. Memoirs v. Massachusetts*, 383 U.S. 413, 446 (J. Clark, J., *dissenting*) (1966)). This suggests that the taboos are at work in some courts at the federal level, and even in the nation's highest court during the Warren era.

That's as may be, but we are modern Americans, not Victorian prudes. Such taboos are utterly opposed to "uninhibited, robust and wide open debate" – and they have no place at work in a modern university, let alone in a federal court that sits in review of a state run institution and professes to be a fierce guardian of free

---

[1]     Marshall's brief in *Brown* (apparently dated September 22, 1952) can be found in Westlaw at *1952 WL 47265*. The psychometrician Otto Klineberg, whose work is quoted herein, was cited several times in the brief (footnotes 15, 16 and 17) and was cited as an expert author of no less than four scientific books on race and race differences Marshall had offered to the Supreme Court, of which <u>Negro Intelligence and Selective Migration</u> was one.

Clearly, Thurgood Marshall was not afraid to openly raise the issue of racial differences in intelligence. *Neither should we fear such discussion – unless we have lost too much nerve since Marshall's days as a litigator over seventy years ago.*

speech. "Lie still, and think of England" was dishonest advice for a Victorian bride confronted with the drama of her wedding night. Manchester, <u>The Last Lion: Winston Spencer Churchill: Visions of Glory, 1874-1932</u>, (Bantam Doubleday Dell Publ Group: New York, 1983, p. 62). In like manner, "Lie still, and think only of environmental causes" is dishonest advice for an intelligence researcher confronted with the drama of racial difference today. The environmentalist may or may not be correct in this great debate, but they cannot be spared the clarifying rigor that results from clashing with their hereditarian foes. Especially in higher education, that is the ideal. *Wieman v. Updegraff*, 344 U.S. 183, 197 (1952) (Frankfurter, J., *concurring*).

The TCP database which Professor Pesta used in his research either does or does not support the conclusion that there are genetic causes for the racial differences in intelligence which have long been documented. But that question needs to be asked, and that conclusion tested, without, like some all too delicate virgin from Queen Victoria's time, fleeing the subject because the truth might be too terrible to bear. Deliberately misreading regulations in service of this modern prudery cannot be countenanced.

## IV.    STATEMENT OF CASE

The ruling under review is Opinion and Order dated October 7, 2024. Order RE.73, PageID#3963. Appellant Bryan J. Pesta is a research psychologist. One of his areas of interest is intelligence. Prior to being stripped of tenure and fired, he had spent decades at Cleveland State University, first as a student and later as a full professor.

In September of 2018, he submitted an application for restricted access data maintained by the National Institutes of Health, which would form the basis for his landmark "Global Ancestry" paper. *Transcript, RE.56, PageID##pp.2967-2968; Third Request, RE.38-12, PageID##1019-1029; see also Transcript, RE.53, PageID##2181-2184.* Specifically, the restricted access data is known as the "TCP" (short for "Trajectories of Complex Phenotypes"[2]). *Transcript, RE.56, PageID#2962.* Professor Pesta indicated in this September 2018 request that he intended to study whether there was a genetic basis for racial differences in intelligence. *Third Request, RE.38-12,PageID##1019-1029 and Transcript, RE.56, PageID#2991.* It is a topic which has long been disputed in the field of intelligence research. *Final Report, RE.38-5, PageID##926-927 and Transcript, RE.54, PageID##2651-2652.*

The September 2018 request was Pesta's Third Request for the TCP data submitted that year. In his First Request, Pesta had proposed to use the TCP data to study sex differences in intelligence (*Transcript, RE.38, PageID#681*), but the files proved too large to manage for that project. In his Second Request, Pesta had proposed to study mental health and ethnicity/race (*Transcript, RE.38,*

---

[2] This same database is sometimes referred to as "PHS000607" (*Transcript, RE. 56, PageID##2961-2965*); it is also sometimes referred to as the "Philadelphia Neurodevelopmental Cohort." *Id., PageID##2849, 2960-2961.* These references all indicate the same database, *viz.* the TCP database. *Id.*

*PageID#684 and Second Request, RE.38-9, PageID##990-991 and Transcript, RE.56, PageID#2966*), but did not get around to researching that topic. Pesta's Third Request covered the ground surveyed in the "Global Ancestry" paper at the heart of this litigation. *Transcript, RE.56, PageID##2967-2968, 2978, 2991; see also Third Request, RE.38-12, PageID##1019-1020.*

Although the district court said otherwise, it is absolutely untrue that Professor Pesta failed to disclose his intention to study whether there was a genetic basis for racial differences in intelligence. In fact, Appellee Ward would later admit under oath that Professor Pesta was cleared to research that very subject by his Third Request of September 2018: "Correct. So then under the third request, I guess under the new DAR, he could conduct that research then." *Transcript, RE.56, PageID#2991.*[3] And Appellee Ward should know. A Ph.D. in chemical engineering, Ward works in CSU's Office of Research Integrity and is the expert CSU relies upon to see that technical regulations are followed. *Transcript, RE.53, PageID##2231.* Ward was even appointed the "Research Integrity Officer" to oversee the investigation into Pesta's alleged research misconduct. *Transcript, RE.56, PageID#2819 and Final Report, RE.38-5, PageID#796.*

---

[3] *See also, Third Request, RE. 38-12, PageID##1019-1020; Transcript, RE.54, PageId#2680.*

Moreover, both the NIH and CSU conducted "investigations" of Professor Pesta's research. But, contrary to the distortions of the record offered by Appellees below, neither institution would ever find that Professor Pesta had failed to disclose that he intended to research the subject of his "Global Ancestry" paper in his Third Request of September 2018. *Final Report, RE.38-5, PageID#800-802, 811-812, 814-816.* In holding otherwise, the lower court simply ignored Appellee Ward's explicit admission at *Transcript, RE.56, PageID#2991*, just as it ignored the lack of a finding by either the NIH or by CSU regarding the Third Request, and other evidence.

Next, for part of his research for the "Global Ancestry" paper, Professor Pesta used a Dutch server (*Final Report, RE.38-5, PageID#831*) to perform an operation known as "phenotyping." That is, he ran data derived from the TCP through said Dutch server to determine skin color and eye color associated with the genetic data. *Id., PageID##829-833 and Transcript, RE. 63, PageID#3685-3686.* The NIH permits researchers to conduct phenotyping with the TCP data and has in fact allowed other researchers to perform such tests using the very same Dutch server. *Final Report, RE.38-5, PageID##880-881 and Transcript, RE.63, PageID##3685-3690.* But researchers are supposed to obtain permission from the NIH to use the Dutch server ahead of time. *Final Report, RE.38-5, PageID#815*

*and Transcript, RE.54, PageID##2673-2674.* Failing to obtain permission ahead of time is a technical infraction of the NIH regulations.

But Pesta was not solely liable for this technical infraction. In fact, the three-way contract formed when a researcher is approved for restricted NIH data places primary responsibility on CSU—not Professor Pesta—to ensure that the proper permissions were obtained to use the Dutch server. *Transcript, RE. 63,PageID##3648-3649; NIH Best Practices Form, RE. 38-8, PageID#981 (noting:"Under the GDS Policy, <u>the recipient institution is ultimately responsible for maintaining the confidentiality, integrity and availability of the data to which it is entrusted by the NIH.</u>"); Second Request, RE.38-9, Page ID#995 and Third Request, RE.38-12, PageID#1023.* And Pesta's stance is not and has never been that he was not without some responsibility for the Dutch server, only that the point was so obscure that no one else discerned the infraction, either.

Pesta's use of the Dutch server was called to the attention of both the NIH and CSU no later than September of 2019. *Final Report, RE.38-5, PageID##808, 847; Transcript, RE.56, PageID##2895-2896, 2901-2902, 2916-2917; Transcript, RE.63, PageID#3685.* However, after being alerted to Pesta's use of the Dutch server, even CSU's Office of Research Integrity continued to certify to the NIH that Pesta was fully compliant with all NIH rules and regulations in his use of their data. Specifically, CSU's Office of Research Integrity (Appellee Ward's bailiwick)

certified that Pesta's use of the TCP was lawful and compliant with all NIH rules and regulations on December 13, 2019 and December 23, 2019, and certified him to access another restricted access data set from the NIH on June 24, 2020, and August 12, 2020. *Final Report, RE.38-5, PageID#925; and Transcript, RE.53, PageID##2215-2216; see also Transcript, RE.63, PageID##3648-3652.* The NIH, too, continued to accept these certifications and process Pesta's applications as late as February of 2020. *Final Report, RE.38-5, PageID#925.*

Pesta, however, would prove to be the only one disciplined for this obscure infraction involving the Dutch server. *Transcript, RE.63, PageID##3672-3673, and 3675-3678.* No one else within CSU who bore responsibility even appears to have been questioned about the shared error. *Id.*

Moving on, before the complaints from people who wanted Professor Pesta muzzled, CSU's Office of Research Integrity had reviewed Pesta's research proposals for the TCP data and did not find that such research required what is known as "Institutional Review Board approval" (or "IRB approval"). *Transcript, RE.63, PageID##3659-3660 and Deposition Exhibit, RE.63-1, PageID#3798.* At CSU the IRB "exists *to interpret and apply the Federal Regulations pertaining to research involving human subjects* conducted by CSU Faculty, Staff, and/or Students. (accessible as of May 28, 2024, at www.csuohio.edu › sprs › irb). IRB approval is required when a researcher is engaged in what is known as "human

subjects" research as that term of art is defined in the CFR at 45 CFR 46.102(e)(1). *Affidavit, RE.64-1, PageID##3851-3852*.

But none of Pesta's research for his "Global Ancestry" paper, including his use of the Dutch server, constituted "human subjects" research under 45 CFR 46.102(e)(1).  *Id.; see also, Transcript, RE.63, PageID##3662-3663*.

In fact, when CSU's Office of Research Integrity submitted the certifications to the NIH referenced above, they contained specific references to IRB approval, to wit, "relevant institutional policies and applicable federal, state, or local <u>laws</u> <u>and regulations (if any)</u> *have been followed, including IRB approval if required*." (emphasis supplied).  *Renewal for Second Request, RE.38-11, PageID#1010; Renewal for Third Request, RE.38-13, PageID#1036*.

Later, during CSU's investigation into Pesta's alleged research misconduct, the rest of CSU's Investigative Committee would ask Ward if IRB approval had been necessary for Pesta's "Global Ancestry" paper.  *Transcript, RE.63, PageID##3659-3660 and Deposition Exhibit, RE.63-1, PageID#3798*.  Ward would effectively answer that no IRB approval had been obtained because it was not necessary:

> Q. Would you agree with me that on September 20th of 2021, Wendy Regoeczi asked you if Pesta received IRB approval from CSU?
>     A.  Right.
> Q. And you responded no approvals obtained because and you cited the NIH policy saying the IRB was not required, right?

> A.   Right.
>
> Q. Fair to say that you were confused about this issue in September of 2021?
>
> A.   I guess what I stated was that NIH approval [was] not required and –
>
> Q. And you left it at that?
>
> A.   And I left it at that.

*Id.*

But the CSU Appellees would convict Pesta of failing to obtain IRB approval anyway.

Next, Pesta and one of his research assistants, a graduate student named John Fuerst, formed a not-for-profit LLC (the Human Phenome Diversity Foundation, LLC or "HPDF") to help fund research in this politically explosive area.  During the research for the "Global Ancestry" paper, they used funds from the not-for-profit LLC to purchase a more high-powered computer and to pay for meals and cab rides for the graduate student (to take Fuerst to and from Pesta's home, where the analysis was being conducted).  *Final Report, RE.38-5, PageID##899-903.*  None of this even appears to implicate §III (B), subparts (1), (2), (3) and (4) of CSU's Conflict of Interest Policy (*Affidavit, RE.64-1, PageID##3853-3854, ¶¶23-28 and Conflict of Interest Policy, RE.64-2, PageID##3868-3869*); nor was there ever any finding that Pesta had violated any aspect of §III (B), subparts (1), (2), (3) and (4) of CSU's Conflict of Interest Policy. *Final Report, RE.38-5, 800-802*.

14

Perhaps most crucially, CSU's Conflict of Interest Policy provides that it is only *intentional disregard* of the policy which could form the basis for an academic research misconduct investigation. *Conflict of Interest Policy, RE.64-2, PageID##3870 and 3873 (§IV. H (Compliance) and §V. G(2) (Compliance)).* But there was never any finding that Pesta had intentionally violated CSU's Conflict of Interest Policy. *Final Report, RE. 38-5, PageID##800-802.*

In fact, after studying the matter for several months, the Investigative Committee could not determine if the Conflict of Interest Policy even applied to Pesta's research. *Transcript, RE.57, PageID#3129.* But CSU's Provost would gratuitously assume that the Investigative Committee meant to find Pesta guilty of violating the Conflict of Interest policy and read that finding into their report — without ever bothering to confirm that Pesta had violated the policy. *Transcript, RE.53, PageID##2326-2330.*

On August 30, 2019, Professor Pesta published the academic paper "Global Ancestry."[4]  It is undisputed that Pesta's contribution to this inquiry represents a landmark study in the field. *Expert Affidavit, RE.45, PageID##1512-1513 at ¶23 and Expert Report, RE.45-1, PageID##1535-1536..*  While experts have long divided between those who maintain that the intelligence differences are due to

---

[4]  The full title is "Global Ancestry and Cognitive Ability."  Note that within the academic context the paper is often referred to with the shorthand title "Lasker at al., 2019," which is how the paper is referenced in several places in the record.

environmental causes and those who maintain that such differences have genetic origins (*Expert Affidavit, RE.45, PageID#1510*), Pesta's "Global Ancestry" study was and remains the largest sample to date to utilize actual genetic material (as opposed to self-identified race or ethnicity, or less precise biological data, such as blood allele typing, which was utilized in the 1970s). *Expert Report, RE.45-1, PageID##1533-1537*.

Contrary to the erroneous inference drawn by the district court (*Cf. Order, RE.73, PageID##3965, 3972*), although Pesta has researched and published on intelligence differences in the past, "Global Ancestry" was his first foray into this politically explosive question, where he specifically looked at genetic data and came out on the side of the hereditarians. *Affidavit, RE.64-1, PageID##3863-3864*. In fact, like any careful thinker who considers all sides of an issue, Pesta had published at least one article in the past attacking the hereditarian point of view. *Id., at ¶55, citing to the 2015 Pesta article, "Only in America: Cold Winters Theory, race, IQ and well-being."*

The record below showed that science in this area is susceptible to heavy political pressure and has been for decades. *e.g. Transcript, RE.55, PageID##2757, 2760-2761, 27633, 2768-2774*. Raise arguments in favor of what those in the field call the "hereditarian position" and one risks various forms of harassment, including protest and even assault at universities.   Evidence of such widespread

hostility and violence was provided by Dr. Charles Murray, who testified that his best-selling book <u>The Bell Curve</u> was controversial because of its discussion of race and IQ, and that he actually needed security when speaking at campuses after its publication because of the threat of violence – a malign pattern that has persisted for decades. *Id.* Dr. Murray placed his travails along a continuum of those afflicting other researchers on intelligence who have openly discussed the hereditarian position, such as pioneering scientist Dr. Arthur Jensen; Dr. Richard Hernstein (his co-author on <u>The Bell Curve</u>), and Nobel Prize winner Dr. James Watson. *Id. pp. 2763-2767; see also, Transcript, RE.53,PageID##2386-2387.*

In fact, even discussing other men's hereditarian research presents dangers and has caused some in the academy to lose their positions, as occurred with Nobel Laureate Watson in 2007 (*Transcript, RE.53,PageID##2386-2387*), and as Dr. Stephen Hsu testified occurred when he was driven from the administration at Michigan State University in 2020. *Transcript, RE.52, PageID##1903-1921.* (Notably, some of the same censors who laid siege to Pesta had mined MSU's campus for Dr. Hsu, with Mr. Kevin Bird as a notable sapper.)

Such is the backdrop against which academics who research these issues must operate. It is one that Provost Bloomberg understood to some degree (*Transcript, RE.53, PageID##2133-2134, 2395*), although the district court registered none of it.

17

But consistent with this lamentable trend, in September of 2019, both CSU and the NIH were beset by a group of academic activists who were angered by Pesta's conclusions in "Global Ancestry." *Final Report, RE. 38-5, PageID##808-809, 847-848; Transcript, RE.56, PageID##2895-2896, 2901-2902, 2916-2917.* These were the individuals Pesta has referred to as the "Bird et al." censors: Mr. Kevin Bird, Mr. Os Keyes, Dr. Jedidiah Carlson, and Dr. Cathryn Townsend, which are found at Appellees' Final Report. *Final Report, RE.38-5, PageID##808-809.* Notably, when the CSU Appellees interviewed Mr. Bird and his colleagues on September 30, 2021 (*Id., PageID##846-864*), one of the very first things they discovered was that the "Bird at al." censors wanted to use – or rather abuse – regulations as a means of silencing Pesta's viewpoint on the race/IQ debate. *e.g. Id. PageID#848*   They were quite clear that they began looking into the technicalities of Pesta's data access requests to the NIH with the sole purpose of interdicting Pesta's point of view in this controversial field. *Transcript, RE.63, PageID#3743.*

Among the very first complaints that both the NIH and CSU received from the Bird et al. censors raised the issues of: a) whether Pesta had violated the "DUC" (or data use certification with the NIH[5]) for the Third Request by

---

[5] When a scholar, such as Pesta, wants to use data from the NIH, he submits an application through his university, which is called a Data Access Request or "DAR." *Transcript, RE.56, PageID##2957-2958, 2965-2967.*  In order for the

researching a genetic basis for racial differences in intelligence; and b) whether Pesta's use of the Dutch server violated NIH regulations. *Final Report, RE.38-5, PageID##808-809, 847 and Transcript, RE.63, PageID#3685.*

Upon receiving complaints from the Bird et al censors, the NIH immediately leapt into action and sent an email querying Pesta about his use of the TCP database on September 19, 2019. *NIH Email 9/19/19, RE.46-1, PageID#1544.* In that email, the NIH laid special emphasis on Pesta's Third Request for the TCP database, inquiring how his research was consistent with that request. *Id.* By contrast, the NIH made no reference to any of Pesta's other requests for the TCP database. Furthermore, despite the issue being raised by the Bird et al. censors, the NIH made no inquiry whatsoever about Pesta's use of the Dutch server. The very next day Pesta answered what were the NIH's then concerns, conclusively. *Pesta Email 9/20/19, RE.46-2, PageID#1548-1551.*[6]

---

NIH to agree to a scholar's request for access, both the scholar and his university have to commit to abide by the NIH's terms of data access, which are found in what is called a "Data Use Certification" or "DUC." *Transcript, RE.56, PageID##2957-2959.* The DUC is also known as a "Data Use Agreement;" they are one and the same thing. *Transcript, RE. 63, PageID#3684; see also, PageID##3602-3603.* This is a model form that is appended to a Data Access Request/DAR. *Transcript, RE.56, PageID#2958.*

[6] "Conclusively" is the right word. When the NIH belatedly came back on May 27, 2021, they tacitly accepted every argument Pesta had made, *for they did not find against him on even a single allegation they had initially pursued*. Instead, the NIH summarily convicted Pesta of misusing the TCP data on three separate grounds they had never even inquired about in their September 19, 2019 email to Pesta.

19

For its part, CSU did nothing of any substance then, although Appellee Ward, more than a year later, belatedly began to review the allegations against Pesta at some vaguely identified time in late 2020. *Transcript, RE.56, PageID##2919-2920.*

Meanwhile, both CSU and NIH continued to process Pesta's applications and renewal applications for restricted data, for both the TCP database and other restricted databases, all the while certifying that Pesta was in compliance with NIH rules and regulations. *Transcript, RE.56, PageID##2963-2965; Final Report, RE.38-5, PageID#925; Transcript, RE.53, PageID#2215.*

But on May 27, 2021, that is almost two full years after its single email inquiry, the NIH suddenly announced that Pesta was found to have violated NIH regulations in three specific ways: 1) he had violated the DUC for his Second Request by researching the subject of race and intelligence, instead of researching race/ethnicity and mental health; 2) he had used the Dutch server for phenotyping without prior permission; and 3) he had failed to report the "Global Ancestry" paper at the time of a renewal request. *Final Report, RE.38-5, PageID#811-812.*

The NIH's findings warrant scrutiny, not least because their "full" investigation (the district court's characterization – *see Order, RE.73, PageID.#3973*) consisted of a single email to Pesta and his reply thereto, followed by a summary letter almost two years later.   Although it had been the focal point

20

of the initial inquiry (*NIH Email 9/19/19, RE. 46-1, PageID#1544*), violating the DUC for the Third Request by researching a genetic basis for racial differences in intelligence is not a finding the NIH made against Pesta.  *Final Report, RE.38-5, PageID##811-812.*  Instead, the NIH exploited the fact that Pesta had other applications open for the TCP and that researching a genetic basis for racial differences in intelligence had not been mentioned in these.  Specifically, the NIH "convicted" Pesta of violating the research terms of his Second Request for the TCP data because that request indicated that Pesta had intended to study ethnic differences in mental health/schizophrenia.  *Final Report, RE.38-5, PageID##806 and 811 (note references to "project #19090").*

And the NIH discretely passed over the fact that Pesta's Third Request had cleared him to do that very research.

Of course, the Third Request was open and approved at the same time as the Second Request.  *Transcript, RE.56, PageId#2977.*  Thus, the Soviet logic of the NIH was that Pesta had violated the research terms of his Second Request by studying a subject they had approved and cleared in his Third Request.  How any researcher who has multiple applications open and approved at the same time would not be liable for a violation under this strained reading of the regulations has never been explained.  But that is what the allegedly trustworthy NIH concluded.

And the CSU Appellees followed this same twisted logic, hence this exchange with

Appellee McLennan of CSU's Investigative Committee:

> Q.    Dr. McLennan, do you still stand by the notion that Dr. Pesta
> violated the DUC for the second request by doing research under
> the third request?
>        A.    Yes.
> *Transcript, RE.54, PageID##2678-2679.*

The record below contained evidence that the NIH had taken a political turn

and had begun to censor research topics concerned with race and ethnicity right

around the time that Professor Pesta came under scrutiny.  *Expert Affidavit, RE.45,*

*PgaeID#1513.*  In this regard, it is significant that other apparently well-respected

researchers simply assume that the NIH has adopted policies that interdict studying

the hereditarian viewpoint that Pesta reached in his conclusions. *Final Report,*

*RE.38-5, PageID##855, 869-870, 873.*  The taboos surrounding race have

apparently grown so onerous that even scientific agencies within the federal

government have begun to stifle inquiry into certain topics, lest the so-called

"wrong viewpoint" be reached.

Nevertheless, on or about June 9, 2021 CSU punished Pesta for the findings

made by the NIH, when Pesta was issued a "Letter of Reprimand."  *Letter of*

*Reprimand, RE.53-2, PageID#2527-2531.*   The Letter of Reprimand for the NIH

violations dealt Pesta a number of sanctions, including the denial of faculty merit

raises for three years and the need to undergo CSU's "Responsible Code of Research" training prior to his next research study.

Despite already punishing Pesta based on the NIH findings, the CSU Appellees proceeded to conduct their own investigation.  This was supposed to be conducted pursuant to CSU's Misconduct Policy at Ohio Administrative Code §§3344-28-01 et seq,[7] focused on what is defined as "academic research misconduct."  "*Misconduct*" under the university's code of conduct is a term of art that does not mean any infraction, just as in law a felony does not mean any violation of the penal code, but is reserved for more serious offenses.  Notably, *misconduct* under CSU's code excludes honest error. *Policy, RE.38-31, PageID#1165 and Transcript, RE.56, PageID##2862-2863.*

Appellees Ward, McLennan, Mallett, and Regoeczi then embarked on an investigation rife with procedural and substantive deviations from the Misconduct Policy, deviations which were all to Pesta's detriment.

CSU's Misconduct Policy makes clear that faculty are entitled to "full freedom in research and to full freedom in the publication of the results of those research endeavors"; moreover, the Misconduct Policy underscores this by stating, "The primary responsibility of the faculty is to their subject and to seeking and

---

[7] The Misconduct Policy or "Policy" is found at *RE. 38-31, PageID##1162-1188.*

stating the truth." *Policy, RE.38-31, PageID#1162 and Transcript, RE.53, PageID##2129-2130.*

However, in derogation of §3344-28-01(A) Pesta was given no credit whatsoever for the fact that in "Global Ancestry" he had succeeded in fulfilling his primary responsibility on a pressing issue in his subject. *Cf. Transcript, RE.56, PageID##2827-2828.* Instead, Ward testified that although he knew the entire Misconduct Policy should be construed around that primary responsibility (*Id. PageID##2821-2822, 2845*), and that Pesta's primary responsibility took precedence over the manner in which he conducted his research (*Id. PageID##2834-2835*), he avoided living up to this crucial aspect of the Policy. Thus Ward, as the RIO overseeing Pesta's investigation, claimed he was simply not interested in whether Pesta had fulfilled his primary responsibility under the code. *Id. PageID##2842-2844.*

But Ward's strange disavowal was belied by other evidence produced in discovery. It transpired that when Ward began his review, the Provost had specifically charged him with exploring whether Pesta had met his primary obligation under the Misconduct Policy. *Transcript, RE.63, PageID##3717-3727 and Provost Memo, RE.63-3, PageID##3807-3808.* At the outset, Ward had received an undated memo from the Provost's office which put him under a mandate to investigate three points, one of which was "Possible consistent

24

misrepresentations of the data measured, the statistical analyses, and reported results such that a reanalysis of the same data would not replicate the findings in Pesta's publications." *Id., PageID#3807.*

In other words, if another objective researcher tested the TCP database, would it bear out Pesta's conclusion, which was that genetics was "a potential partial explanation for group mean differences in intelligence between blacks and whites?" *"Global Ancestry" paper, RE.38-3, PageID#752.* Because if Pesta had intentionally falsified his results, that would clearly have amounted to much more serious research misconduct than technical errors on a data access form.

Yet that issue was never taken up by the Investigative Committee (it bears stressing that the other two issues raised in the Provost's memo were taken up[8]). Indeed, Ward never even charged the committee with looking into this issue. *Final Report, RE.38-5, PageID##806-807.* Why was what could have been the most serious allegation against Pesta passed over in silence?

The answer seems to be: because like Czesław Miłosz's "captive minds," Appellees did not want to know the answer to this question – perhaps because they fear that Pesta is likely correct. Indeed, the evidence strongly suggests that Ward

---

[8] The other issues were 1) misrepresentation of the purposes of the research project that led to "Global Ancestry" and 2) the phantom IRB violation, both of which were addressed with typical carelessness at *Final Report RE. 38-5, PageID##800-801.*

looked into this issue just long enough to realize that Pesta had in fact answered a long standing inquiry within his field, but the implications were too politically explosive. *Transcript, RE.63, PageID##3718-3726*.

In any event, on July 26, 2021, Defendant Ward impaneled an Investigative Committee consisting of Appellees Mallett, McLennan, and Regoeczi. *CSU Final Report, RE.38-5, PageID#806*. They conducted various interviews with some (but not all) complainants against Pesta (the notable exception was their failure to interview anyone from the NIH), and eventually transmitted a "Final Report" to the Provost, who issued a Letter dated January 13, 2022, which set the stage for stripping Pesta of tenure and firing him. *Final Report, RE.38-5, PageID##957-964 and Termination Letter, RE.38-24, PageID#1108-1109*.

§§3(C) and 4(C) of the Policy required CSU to immediately assess and, if possible, informally resolve allegations made against Pesta. *Policy, RE.38-31, Page##1168, 1171*. But Ward not only failed to do this – he imported a wholly unsupported and unwritten provision into the Policy at the urging of the NIH which prevented him from informally resolving any of the allegations against Pesta. *Transcript, RE.56, PageID##2855-2857, 2861-2862, 2865-2870, 2872-28733, 2895-2896, 2899-2900, 2904-2905*. This resulted in subjecting Pesta to a lengthy investigation for which there never was any basis, even on issues that Ward clearly understood were unfounded, such as whether Pesta had been cleared to conduct the

research for "Global Ancestry" and whether he needed IRB approval for such research.

Next, Ward violated §3(D) of the Policy by moving straight to the highest level of review (viz. "Investigation") without the consent of Pesta. *Transcript, RE.56, PageID##2872-2874, 2922-2923; Cf. Misconduct Policy, RE. 38-31, PageID#1168, 1174, 1179.*

In doing so, Appellee Ward also violated §§3(K) and 5(B) of the Policy, which conveniently failed to provide Pesta with the opportunity to question witnesses before an Inquiry Committee composed of at least two individuals who were unbiased and qualified to judge the evidence against him. *Transcript, RE.56, PageID##2876-2878, 2880, and 2882.*

Ward also violated §1(A) of the Policy by appointing committee members who proved barely capable of hiding their bias against Professor Pesta. *Final Report, RE.38-5, PageID##798-799; Deposition Exhibit, RE. 57-1, PageID##3294-3295; Deposition Exhibit, RE.57-2, PageID#3296; and Transcript, RE.54, PageID##2607-2610, 2619-2628.*

Perhaps most seriously, Appellees Ward, Mallett, McLennan and Regoeczi violated §§3(K) and 6(I) of the Policy (*Policy, RE.38-31, Page##1170, 1181-82*) by refusing to let Pesta question witnesses before the Investigative Committee. Ward, Mallett and McLennan had no coherent explanation for refusing to provide this

27

safeguard to Pesta. *Transcript, RE.56, PageID##2880-2887, 2933; Transcript, RE.57, PageID##3138-3145; Transcript, RE.54, PageID##2660-2663.*

Indeed, the failure to provide Pesta the opportunity to cross examine any witnesses against him was especially egregious because the Investigative Committee effectively hid their intentions from Pesta.  Thus, when Pesta asked (at the end of his own interview on September 7, 2021) who else the committee planned on interviewing, they failed to tell him that they would interview three of the individuals responsible for the "Bird et al." allegations, nor did they tell him that they would interview Dr. Taylor.  *Final Report, RE.38-5, PageID##843-844 and Transcript, RE.57, PageID#33143.*  Part of McLennan's response was actually, "We don't know that yet. *So we carefully read the CSU policy and that's exactly what we're trying to follow.*"  *Final Report, RE.38-5, PageID#844 – emphasis supplied*.

But obviously, Appellees were not "exactly" following §§3(K) and 6(I) of the Misconduct Policy.  When Pesta realized that the committee had in fact interviewed witnesses outside of his presence, he protested, saying "My perception is that the interview process here is unfair... I am stuck trying to rebut their claims without the luxury of cross examination."  *Final Report, RE.38-5, PageID##, 879; see also PageID#882*.

28

Then, too, for at least one complainant (Dr. Kent Taylor), the committee actually provided him with questions ahead of time. *Id. PageID## 865-866; see also, Transcript, RE.54, PageID##2660 and Transcript, RE.57, PageID#3166.*

The violations off §§3(K) and 6(I) of the Misconduct Policy only grew more egregious, for the fact is that once Pesta belatedly discovered that witnesses against him had been interviewed, he did proffer questions. *Final Report, RE.38-5, PageID##879-882.* Having refused to provide Pesta with the ability to "write out questions to be asked of witnesses during an investigation, hear the answers, and submit for response any follow-up questions," one would think that the committee would at last relent and transmit Pesta's questions to his accusers.

But no: in yet another violation of §§3(K) and 6(I) of the Misconduct Policy, the committee refused to do that either. And Appellee Ward, under a mandate to ensure Pesta was treated fairly, made no effort to see that his hand-picked committee abided by §§3(K) and 6(I) of the Misconduct Policy. *Transcript, RE.56, PageID##2883-2887.*

The result was that Pesta was given no notice that the committee would interview the complainants against him; denied the ability to "write out questions to be asked of witnesses during an investigation, hear the answers, and submit for response any follow-up questions"; even denied the second rate confrontation that could have occurred if the witnesses against him were at least forced to answer his

29

questions at a later point in time; but at least one of his accusers was lobbed softballs ahead of time.

For her part, Appellee Bloomberg testified that she understood that Pesta had been denied the safeguards of §§3(K) and 6(I) of the Misconduct Policy (*Transcript, RE.53, PageID##2358-2360, 2372-2373*), but essentially washed her hands of the matter. (However, see *Id., PageID##2226-2228*, where Bloomberg testified that she was charged with seeing that the Misconduct Policy was followed.)

Next, Appellees Ward, Mallett, McLennan and Regoeczi violated §6(H) of the Policy (*Policy, RE.38-31, PageID#1181*) by failing to formally interview and record one of the chief complainants against Pesta — the NIH itself in the person of Dr. Lauer. *Transcript, RE.56, PageID##2934, 2937, 2939-2947 and Deposition Exhibit, RE.56-2, PageID#3068.* Instead of recording an interview with Dr. Lauer before the Investigative Committee, an attorney in Ward's Office of Research Integrity held a *sub-rosa* conversation with Dr. Lauer and then transmitted the substance of that conversation, outside of Pesta's knowledge, to Appellee Bloomberg, who relied in some part on that illicit conversation in her January 13, 2022 Letter (*Final Report, RE.38-5, PageID##957-964*), thus managing to violate §§3(K), 6(H), (I), (K)(5) and of the Misconduct Policy.

Continuing their disregard of the Policy, Appellees Ward, Mallett, McLennan and Regoeczi again violated §1(A) of the Policy by simply ignoring

each and every argument Pesta had made that refuted the Investigative Committee's findings. *Transcript, RE.54, PageID#2678*; *Final Report, RE.38-5, PageID##946-956.*

Appellees Ward, Mallett, McLennan and Regoeczi then violated §§3(B) and (E) of the Policy by permitting Ward to make substantive changes to the draft of the Final Report, substantive changes which ensured that Pesta could be found guilty of misconduct at the appropriate evidentiary standard. *Transcript, RE.63, PageID#3636, 3705-3714 and Deposition Exhibit, RE.63-2, PageID#3801-3806.*

All Appellees violated §6(J) of the Policy by failing to include in the Final Report any of the intermediate administrative actions that CSU had already taken against Pesta in the Letter of Reprimand. *Transcript, RE.53, PageID##2278-2282 and Deposition Exhibit, RE. 53-2. PageID#2527-2531.*

Appellee Bloomberg then violated §6(K) by issuing a decision based on matters that went beyond the findings of the Investigative Committee, for example, by supplying findings that were not made by the Committee (*Transcript, RE.53, PageID##2332-2333*), considering matters outside the Final Report as furnished by the Committee (*Final Report, RE. 38-5, PageID#960; cf. PageID##800-802*), and sustaining the findings of the Committee even where the Provost herself failed to agree with the often farcical findings of the Committee. *Final Report, RE.38-5, PageId#958 and PageID##800-802; cf. Transcript, RE.53, PageID##2228-2229.*

31

Indeed, at deposition, Provost Bloomberg could not coherently defend agreeing with the Investigative Committee's ridiculous findings and instead took refuge in looking at what she repeatedly referred to as "the totality" of Pesta's alleged misdeeds. *Transcript, RE.53, PageID## pp. 2249, 2260-2261, 2264-2265, 2267-2268*.   A representative quote: "By the time it got to my desk, I was looking at the totality of information, not specific things." *Id., Page ID#2233*.

The result was that Appellees produced a Final Report (*Final Report, RE. 38-5, PageID##800-802*) which finds five discrete grounds of alleged misconduct (*Transcript, RE.53, PageID##2142-2146*), not the four vaguely referenced by the district court at *Order, RE.73, PageID##3968-3969*.

These five grounds *do not* squarely align with the NIH findings of May 27, 2021.[9]  They are insupportable for the reasons set forth below.

## V.    SUMMARY OF THE ARGUMENT

The district court committed two clear errors: first, it violated FRCP 56 by holding the Pesta was fired for alleged research misconduct, rather than for publishing "Global Ancestry."  It reached this erroneous conclusion by construing contested facts against Pesta and even ignoring undisputed facts showing that what

---

[9] In fact, Appellees Ward, McLennan, Mallett, and Regoeczi rejected one of the three findings made by the NIH in the May 27, 2021, letter: there is no finding that Pesta committed error by failing to report "Global Ancestry" on the renewal application for the Second Request (*Final Report, RE.38-5, PageID##800-802*), although that faulty conclusion had been reached by the NIH.

motivated Appellees was not the alleged research misconduct, but Pesta's

conclusions in "Global Ancestry."  The district court helped itself to this erroneous

conclusion by refusing to conduct its own review of the administrative record,

accepting at face value the often farcical findings of Appellees.  Second, doubling

down, the district court applied the standard from *Garcetti*, rather than *Pickering*,

and held that even if Appellees fired Pesta for publishing "Global Ancestry," they

were within their rights to do so.

This is error.  Under *Pickering* the court needed to determine if Pesta had

exhibited knowing falsity or reckless disregard for the truth; and then weigh

whether Pesta's interest in publishing his landmark study outweighed any interest

Appellees had in disciplining him for a *de minimus* infraction.

## VI.   ARGUMENT

## STANDARD OF REVIEW

This Court must review a district court's grant of summary judgment de

novo, viewing all evidence in the light most favorable to the non-moving party.

*Meriwether v. Hartop*, 992 F.3d 492, 502 (6th Cir. 2021). Summary judgment is

appropriate only if there is no genuine dispute of material fact and the movant is

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When the record

reveals disputes regarding motive, intent, or the application of constitutional

principles, summary judgment is improper. *See Mt. Healthy City Sch. Dist. v.*

*Doyle*, 429 U.S. 274, 287 (1977).

# DISCUSSION

## I.    THE DISTRICT COURT ERRED BY INVOKING *GARCETTI*, RATHER THAN *PICKERING* TO WEIGH SPEECH BY A PUBLIC UNIVERSITY PROFESSOR ON MATTERS OF PUBLIC CONCERN.

Since *Meriwether* the Sixth Circuit has explicitly endorsed the two-pronged test from *Pickering* when weighing whether or not speech by a professor at a public university on matters of public concern is protected.  This court made that clear in *Meriwether* and again, most recently, in *Josephson v. Ganzel*, ___ F.4th ____ (6th Cir. 2024).

The trial court was reminded that *Pickering*, rather than *Garcetti*, held the proper standard for this case.  *Brief, RE.64, PageID#3830.*   Nothing daunted, as part of its alternative holding, the lower court reached for *Garcetti* instead. *Order, RE.73, PageID##3973-3974.*  This is clear error, or, to quote this court, "totally unpersuasive." *Meriwether* at 505.

Of course, invoking *Garcetti* spares the need to explain how the lower court could balance against a professor at a public university speaking on matters of public concern.  *Garcetti* at 421; *Meriwether* at 503-504.

*Pickering* balancing would leave Appellees dead in the water for the simple reason that there is no evidence that Pesta's speech in "Global Ancestry" meets the *Sullivan Malice* standard of  false statements knowingly or recklessly made. *Pickering v. Board of Education* at 574 (citing *New York Times v. Sullivan*, 376

U.S. 254 (1964)).  Appellees never even attempted to look at this issue with regard to Global Ancestry.  *Transcript, RE.56, PageID##2842-2844*.  Moreover, Pesta exhibited honesty during investigation in those areas that were probed.  *see e.g., Transcript, RE.57, PageID#3238 and Final Report, RE.38-5, PageID#946 for evidence Pesta's honesty.*

As the Southern District of New York noted over thirty years ago – in another academic freedom case where a university had attempted to use *Pickering* balancing against a professor who dared to discuss "the relative intelligence of blacks and whites" – *Pickering* balancing simply has no place here.  *Levin v. Harleston*, 770 F.Supp. 895, 898 and 921 (S.D.N.Y. 1991), *reversed on other grounds by Levin v. Harleston*, 966 F.2d 85 (2d Cir. 1992).  The balancing test would be over before it had even begun.  *Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 410 (3d Cir. 2022) (Porter, J., concurring).

If we proceed to weigh matters in any case, heavily in Pesta's favor is the fact that he produced a landmark scientific study on racial differences. *Expert Affidavit, RE.45, PageID##1512-1513 at ¶23 and Expert Report, RE.45-1, PageID##1535-1536; See Meriwether* at 504 (*quoting Bonnell v. Lorenzo*, 241 F.3d 800, 823 (6th Cir. 2001) and *citing Dambrot v. Cent. Mich. Univ*., 55 F.3d 1177, 1188–89 (6th Cir. 1995).

Over and against this, properly understood, is the fact that Pesta committed the *de minimis* technical infraction of using the Dutch server without prior permission from the NIH.  But CSU underscored exactly how serious an infraction this was by punishing no one else within the Office of Research Integrity (*PageID##3672-3673, and 3675-3678*) who not only shared responsibility for Pesta's use of the Dutch server, but had primary responsibility for that use under the three way contract with the NIH.  *Transcript, RE. 63,PageID##3648-3649; NIH Best Practices Form, RE. 38-8, PageID#981.*

The weight here is overwhelmingly on Pesta's side, though to be sure the public's interest is entwined with his own.  *Meriwether* at 505: "[W]hen the state stifles a professor's viewpoint on a matter of public import, much more than the professor's rights are at stake."   CSU and the related Appellees had no legitimate interest in coming down on Pesta like a ton of bricks at the behest of unscrupulous activists who were forthright in their calls for viewpoint censorship.  *Final Report, RE.38-5, PageID##848, 874; Transcript, RE.63, PageID#3742-3743; Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829—835 (1995).  Rather, Appellees' true interest lay in serving as "fierce guardians of intellectual debate and free speech." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 761 (6th Cir. 2019).  That interest cannot be served where Appellees served as handmaidens of censors such as Mr. Bird and Co., or the esteemed Dr. Taylor.

We add with Justice Alito, that speech is at its most important where it "is essential to democratic self-government" and "advances humanity's store of knowledge, thought, and expression in fields such as science, medicine, history, the social sciences, philosophy, and the arts." *Murthy v Missouri*, 603 U. S. ____ (2024) (*Alito, J., dissenting*) (*citing to see Snyder v. Phelps*, 562 U. S. 443, 451–452 (2011) and *United States v. Alvarez*, 567 U. S. 709, 751 (2012) (*Alito, J. dissenting*).  Sidestepping this by inartful invocations of the *Garcetti* standard is "totally unpersuasive" indeed.

## II.   THE DISTRICT COURT FAILED TO CONDUCT ITS OWN REVIEW OF THE DEEPLY FLAWED ADMINISTRATIVE RECORD COMPILED BY APPELLEES.

The issue here is the lower court's utter failure to conduct its own review of the findings of research misconduct.   The trial court cannot simply defer to the administrative record in a case where First Amendment retaliation is at issue, but is obligated to conduct its own review of those conclusions because "deference to the administrative record and factfinding is inappropriate."  *Holley v. Seminole County School Dist.*, 755 F.2d 1492, 1502 (11th Cir. 1985) (citations and quotations omitted); *see also, Cockrel v. Shelby Cnty. School Dist.*, 270 F.3d 1036, 1046–47 (6th Cir. 2001).

First Amendment retaliation here not only loomed in the background, but pervaded the entirety of the proceedings from beginning to end.  To start with, the

undisputed record demonstrates that science in this particular area has been beset by political pressures for decades. Consistent with those political pressures, when Pesta's outside censors (Bird et al.) were finally interviewed, among the very first things they made clear to CSU were that they intended to use regulations to effect viewpoint discrimination (*Final Report, RE.38-5, PageID#848* and *Transcript, RE.63, PageID##3742-3743*) – as did "notable critic" Dr. Kent Taylor." *Order, RE.73, PageID##3967*; *Final Report, RE.38-5, PageID#874.*

Viewpoint discrimination is viewpoint discrimination, even if some of the people demanding it hail from the UCLA School of Pediatric Medicine. *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943). And the rule in this circuit is that "[W]hen passing on the validity of a regulation of conduct, which may indirectly infringe on free speech, this Court ... weigh[s] the circumstances in order to protect, not to destroy, freedom of speech." *Bible Believers v. Wayne Cnty,* 805 F.3d 228, 234 (6th Cir. 2015) (*quoting Cox v. Louisiana*, 379 U.S. 536, 578 (1965) (Black, J., concurring).

The investigation by CSU then proceeded in Kafkaesque fashion where the Appellees ignored each and every issue Professor Pesta raised in his favor (*Transcript, RE.54, PageID#2678*), coupled with a cornucopia of serious deviations from the internal policy that, naturally, all militated against Pesta. Discovery later revealed that the Investigative Committee, like the Bird et al.

censors, and like "notable critic" Dr. Taylor himself, hoped to send a message that Professor Pesta's viewpoint was, in itself, unethical.  *Final Report, RE. 38-5, PageID##798-799; Deposition Exhibit, RE. 57-1, PageID##3294-3295; Deposition Exhibit, RE.57-2, PageID#3296; and Transcript, RE.54, PageID##2607-2610, 2619-2628.*

When such is the case, the First Amendment requires the district court to scrupulously examine the administrative record to ensure that the findings were genuine, rather than a pre-textual sham.  *Holley v. Seminole County School Dist., supra; Cockrel v. Shelby Cnty. School Dist., supra.*  Yet nothing of the kind occurred in the court below.  Instead, rather than interpreting the undisputed facts in the light most favorable to Pesta and allowing him all reasonable inference, the trial court blindly deferred to CSU's conclusions.

The trial court's failings are particularly striking in light of Appellee's own abandonment of the administrative record. In the motion below, Appellees made no attempt to justify the five specific findings they relied on to terminate Pesta — which we would expect them to do if the findings were made in good faith. The best they did was make passing mention of these findings in a single paragraph (*Brief, RE.47, PageID#1584*), which was buried deep in their motion.

This should have forfeited the issue under both FRCP 56(c)(1)(A) and governing case law.  "An issue is deemed forfeited ... if it is merely mentioned and

not developed." *United States v. Clark*, 469 F.3d 568, 569-70 (6th Cir. 2006); *see also United States v. Sandridge*, 385 F.3d 1032, 1035-36 (6th Cir. 2004) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (internal quotations and citation omitted).

Moreover, when, in opposition Pesta specifically raised and refuted the five-fold farce that the CSU Appellees had stood on in their Final Report, it was incumbent on Appellees to meet him. But they did not. Their failure to do so should have triggered FRCP 56(e)(2) and rendered Pesta's facts "undisputed for purposes of the motion."

*Pesta Refuted Finding No.1, to which Appellees Failed to Adequately Respond:*

Pesta demonstrated that Finding No. 1 meant that he had committed research misconduct by violating the data use agreement associated with his Second Request for the TCP by researching the subject matter of "Global Ancestry" – even though such research was permitted under the Third Request and its data use agreement/DUC. *Brief, RE. 64, PageID#3822, citing to Final Report, RE.38-5, PageID#800 and Transcript, RE.54, PageID##2678-2679.*

On this point, Pesta pointed out that his Third Request not only cleared him to do the research for "Global Ancestry," but that Appellee Ward had explicitly admitted that it had cleared him to do such research. *Brief, RE.64, PageID##3823-*

*3835, citing, inter alia, Transcript, RE.56, PageID#2991.* He pointed out, too, that

neither the NIH nor CSU ever found that he had violated the research purposes of

his Third Request with his "Global Ancestry" paper. *Brief, RE. 64, PageID##3811,*

*3821, 3824-3825.*

In response (*Brief, RE.72, PageID##3952-3956*), Appellees ignored the

Ward and McLennan admissions completely. Instead they indulged in an irrelevant

argument about how a sabbatical request by Pesta more clearly described his

research than the Third Request, which is utterly immaterial in light of the fact

Ward, McLennan and the NIH, too, all understood that the Third Request indicated

that Pesta would research the subject matter of the "Global Ancestry" paper.

To confuse and compound matters, Appellees had unartfully raised a sham

argument about the Third Request through their expert witness.[10] But the expert

witness never addresses Ward's admission either, nor does he address McLennan's

admission, nor does he explain why neither the NIH nor CSU ever found that the

subject matter of "Global Ancestry" was not covered by the Third Request. The

expert's factitious argument was a sham, which should have been disregarded by

the district court on summary judgment. *In re Fosamax Products Liab. Litig.*, 707

---

[10] In their opposition to Pesta's own motion, (*Brief, RE. 50, PageID#1752, N.9*)
Appellees vaguely reference Oakes's report at "page 16." But page 16 of the
Oakes Report references "Project 19090." That project is the Second Request.
*Transcript, RE.56, PageID#2966.*

F.3d 193, 193–94 (2d Cir. 2013), *citing to AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 736 (2d Cir. 2010).

Appellees then fell back on the authority of the NIH: "The NIH said he failed to comply." *Brief, RE.72, PageID#3954*. And so they did – that is what they said. But any honest and responsible research university would have pushed back against the NIH's Orwellian logic of, "Pesta violated the DUC of the Second Request by doing the research we had cleared him for in the Third Request."

In fact, Appellees' argument here (*Id., PageID#3954*) rests on the NIH's later August 17, 2021 letter (*Final Report, 38-5, PageID##814-817*) — which only confirmed that this twisted logic was exactly what the NIH had deployed. The NIH's August 17, 2021 letter was sent after Pesta had pushed back and reminded the NIH that they had cleared him to research the subject matter of "Global Ancestry" in the Third Request (a/k/a application #19747). *Affidavit, RE.46, PageID#1543 and Pesta Appeal of NIH Findings, RE.46-3, PageID#1554-1558*.

The NIH did not retort that the Third Request did not cover the subject matter. Instead, they underscored their abuse of their own regulations with the following line: "The research you described in your close out report for project #19090 [viz. the Second Request] is inconsistent with the approved RUS for project #19090, which is a violation of the DUC, *regardless of what was proposed in other research projects.*" *Final Report, RE.38-5, PageID#815 (emphasis*

42

*supplied)*.  The layman's translation here is: "We don't care that we approved the subject matter of 'Global Ancestry' under the Third Request.  We're going to find something to hang you on, Racist – science be damned!"  At this point, CSU's stance should not have been, "Lie still and think of federal funding."  It should have been, "Open your eyes and fight for freedom of speech."

Diverting attention from their failures, Appellees then launched into irrelevant arguments about the failure to submit reports.  As usual this is a dodge: the alleged failures were raised before the Investigative Committee (*e.g. Final Report, RE.38-5, PageID#806*), but not even they could find that such actions or inactions rose to the level of research misconduct.  *Id., RE.38-5, PageID##800-802*.

*Pesta Refuted Finding No. 2, to which Appellees Failed to Adequately Respond:*

Pesta demonstrated that Finding No. 2 meant that he had committed misconduct in the manner by which he conducted his research by using the Dutch server.  *Brief, RE.64, PageID#3822, citing to Final Report, RE.38-5, PageID#800.*  There is no coherent argument for why this error was intentional or reckless misconduct by Professor Pesta, but honest error for the people in CSU's Office of Research Integrity who bore primary responsibility under the three-way contract with the NIH.  *Brief, RE.64, PageID##3825-3826; see also, PageID##3817-3819.*

In response, Appellees merely hammered away at the fact that Pesta's use of the Dutch server without prior permission was in fact an infraction (*Brief, RE.72, PageID#3957*), but never acknowledged that CSU and the Office of Research Integrity missed this issue, too.  They instead dodge the issue by arguing:

> Pesta also makes the argument that although he was the Principal Investigator, it was CSU's responsibility to discover that Pesta was using a foreign server.  This ignores that only Pesta and his co-authors knew their plan to send the data to a third party. CSU could not stop it or report it because Pesta hid it.
> *Id.*

But it certainly was not hidden after the Bird et al censors reported the use of the Dutch server in September of 2019 (*Final Report, RE. 38-5, PageID##808, 847; Transcript, RE.56, PageID##2895-2896, 2901-2902, 2916-2917; Transcript, RE.63, PageID#3685*) and CSU's Office of Research Integrity continued to assert that Pesta was in compliance on December 13, 2019, December 23, 2019, June 24, 2020, and August 12, 2020. *Final Report, RE.38-5, PageID#925.*

*Pesta Refutes Finding No.3, to which Appellees Did Not Respond Whatsoever:*

Pesta demonstrated that Finding No. 3 meant that he had violated unspecified terms with the NIH by publishing *a separate paper* on Hispanic IQ *after* he had published "Global Ancestry" (*Brief, RE.64, PageID#3823, citing to Final Report, RE.38-5, PageID#800, and Affidavit, RE.64-1, PageID#3851 at ¶9*) – even though Pesta himself did not actually publish the paper in question, and

even though Pesta demonstrated that the NIH had not clearly forbidden

publication. *Final Report, RE.38-5, PageID##951-952.*

Appellees offered nothing whatsoever in response to Pesta's argument that

he did not in fact publish the paper on Hispanic IQ and that the NIH had not clearly

forbidden publication in any event. *Cf. Brief, RE.72, Page ID##3951-3962.*

*Pesta Refutes Finding No.4, to which Appellees Failed to Respond:*

Pesta demonstrated that Finding No. 4 meant that he had violated CSU's

IRB regulations by using the Dutch server (*Brief, RE.64, PageID#3823, citing to*

*CSU Final Report, RE.38-5, PageID#800-801 and Transcript, RE.54,*

*PageID#2631*) – even though Ward, as the Research Integrity Officer, had

informed the Investigative Committee that IRB approval was not required

(*Transcript, RE.63, PageID#3659-3660*) and even though Pesta's research was not

captured under the IRB regulations. *Brief, RE.64, PageID##3819-3820, citing to,*

*inter alia, Affidavit, RE.64-1, PageID#3851-3852 at ¶¶14-19 and 45 CFR*

*46.102(e)(1), (5) and (6).*

Appellees offered nothing in response to Pesta's arguments on these issues.

*Cf. Brief, RE.72, Page ID##3951-3962.*

*Pesta Refutes Finding No.5, to which Appellees Fail to Adequately Respond:*

Pesta demonstrated that Finding No. 5 meant that he had violated

unspecified CSU regulations by using funds for research derived from the non-

profit LLC. *Brief, RE.64, PageID#3823, citing to Final Report, RE.38-5, PageID##801-802.* This was in some ways the most farcical of all. When Pesta begged to know which policy he had allegedly violated by his actions here, the Investigative Committee replied with a reference to *all* of CSU's policies. *Final Report, RE.38-5, PageID#802; Transcript, RE.57, PageID#3128-3130 and Transcript, RE.53, PageID#2324.* Deposition questioning would confirm that the Investigative Committee responded this way because they did not actually know, after researching the issues for months, which policy Pesta had violated. *Transcript, RE.57, PageID#3128-3130.* Provost Bloomberg gratuitously assumed that they must have meant the Conflict of Interest Policy (*Transcript, RE. 53, PageID##2326-2330*), even though there was no application of that policy, let alone any finding that Pesta had intentionally violated the policy. *Brief, RE.64, PageID#3811-3812, citing to, inter alia, Affidavit, RE. 64-1, PageID##3853-3854 and Conflict of Interest Policy, RE.64-2, PageID##3868-3869, 3870, 3873.*

Appellees offered nothing in response to Pesta's demonstration that the Conflict of Interest policy had no application to the not-for-profit LLC. *Cf. Brief, RE.72, Page ID##3951-3962.*

Faced with this flawed, even absurd administrative record, it was error for the trial court to conclude that "the evidence submitted to the Court overwhelmingly supports Defendants' version of events." *Order, RE.73,*

46

*PageID#3972*.  The plain and obvious duty of the trial court should have been to hold that the administrative record provided no evidence of research misconduct and did not justify stripping Pesta of tenure and firing him.

To further confuse matters, instead of addressing the administrative record, the district court references various collateral issues — which it describes inaccurately — and also misstates Pesta's argument.  The result is a deceptive picture, where Professor Pesta is painted as an academic caught in various confirmed instances of research misconduct, against which he could not mount coherent arguments.

Here the trial court was following Appellees, who ran from the findings in the administrative record, but attempted to camouflage their flight by throwing a host of other allegations at Pesta.  This should not have sufficed.  Shifting ground is, in itself, is evidence of retaliatory animus, rather than evidence of good faith. *Meriwether v. Hartop* at 514-515.

In any event, as shown above, it is not accurate to say that CSU had long been aware of Pesta's research and that he was promoted to a fully tenured professorship after he had published controversial papers on race, genetics and intelligence. *Order, RE.73, PageID##3965, 3972, but see Affidavit, RE. 64-1, at ¶¶51-60.*

47

It also is inaccurate to imply that Pesta had harmed the participants to the original study that resulted in the TCP database or violated their consents. *Order, RE.73, PageID##3965.* Once again, this is hinted at rather than demonstrated — far too much of the controversy surrounding Professor Pesta has consisted of innuendo. Notably, the consents are not set forth anywhere in the record by Appellees. Furthermore, Appellees ran a month's long investigation into Pesta's research for "Global Ancestry" and came forth with no findings that Pesta had harmed any participants from the TCP study; nor did they ever find that Pesta had violated the consents associated with the TCP (*Final Report, RE. 38-5, PageID##800-802*) – even though that very issue had been raised by both Bird et al. (*Id. PageID#808*) and by Dr. Taylor. *Id., PageID#872.*

Nor did the NIH ever find that any consents had been violated by Pesta's research. *Id., PageID##811-812, 814-817.*

In short, this was an issue manufactured late in the litigation on behalf of Appellees to divert the court's attention from the fact that Appellees could not stand on the five-fold farce that resulted from their original investigation.

But the district court went from one erroneous factual assertion to another. It next moves into the after-acquired evidence at *Emails RE. 38-35, PageID##1212-1216 and Emails, RE. 38-38, PageID#1225* and implies (rather than finds outright) that Pesta was guilty of covering up his intent to study a

genetic basis for racial differences in intelligence.  The lower court never addresses Pesta's objection to this after-acquired evidence (*Brief, RE. 64, PageID#3828*) nor does it explain how such evidence was even material in light of Ward's admission that Pesta's Third Request cleared him to do the study for "Global Ancestry." *Transcript, RE.56, PageID#2991.*  In a related error, and again ignoring Appellees' admissions, the district court flatly declares that "None of these requests disclosed that Pesta's primary research topic was a genetic basis for the relationship between intelligence and race/ancestry."  *Order, RE.73, PageID##3967.*

Next, the district court erroneously states, "… when CSU attempted to comply with NIH's directives, it learned that Pesta had stored the data on a personal computer in his home and had allowed Fuerst to improperly access the data." *Id., erroneously citing CSU Final Report, RE. 38-5, PageID##800-801, which contains no such findings.*  But there was no finding that Pesta's use of his home computer to house the data constituted research misconduct; nor was graduate student Fuerst's access of the data ever found to have been improper because it was not improper, as Pesta demonstrated with specific citations to the NIH's own regulations.  *Final Report, RE. 38-5, PageID##800-802; see also, Affidavit, RE.64-1, ¶¶40-41; cf. Brief, RE. 72.*

Moving on, the district court exploits and distorts Pesta's statement that he "screwed up."  *Order, RE.73, PageID##3972.*  This was a minor admission on

Pesta's part: he merely stated here that he had made a clerical error by reporting the "Global Ancestry" paper on a wrong form in one of his submissions to the NIH. *Final Report, RE.38-5, PageID#828.*  It was not an admission of wholesale research misconduct that tainted his use of the TCP, as erroneously implied by the district court.  By contrast, with regard to Pesta's stance *vis-à-vis* the issue of research misconduct, his position was quite clear throughout the entire investigation.  As Pesta stated upon being forwarded the Investigative Committee's findings:

> At the outset, and in response to the dozens of allegations made against me in this investigation, I want to state (as I've done so repeatedly throughout this entire process), that to the extent any of my conduct departed from accepted practices or was otherwise incorrect, I did not "intentionally, knowingly, or recklessly" commit those actions. Specifically, I have never intentionally, knowingly, or recklessly misrepresented my intended use of dbGaP data, used that data to pursue unethical research activity, or improperly shared controlled-access data. I believe that the evidence presented to the committee does not show, nor can it be fairly construed to show, that I did anything with the clear and convincing required intent. *Id., PageID#946.*

Pesta should have been taken at his word here.  As Appellee Mallett conceded, Pesta "was more than forthcoming and honest and open in [the conversations before the Investigative Committee]." *Transcript, RE.57, PageID#3238.*

Distorting Pesta' argument, the district court states:

> Rather than pointing to factual support for his theory – that he was fired due to the content of the Global Ancestry paper – Pesta attacks the NIH and CSU for permitting him to conduct his research and

> for their various findings during the investigations.  For example,
> Pesta argues that his misconduct should have been overlooked
> because CSU and NIH continued to process his applications for
> access to restricted data after they could have realized that his
> conduct deviated from their rules.
> *Order, RE.73, PageID#3972.*

But Pesta has never attacked the NIH and CSU "for permitting him to conduct his

research."  In fact, in accordance with his request for declaratory relief, Pesta

maintains that CSU should shield both his research and that of any others who

wish to explore the hereditarian point of view.  What he has argued is that it is

nonsensical to abuse regulations, as was done here, with cynical manipulations

such as "Pesta violated the purposes of his Second Request for TCP data by doing

research we had cleared him to undertake in his Third Request."  *Transcript,*

*RE.56, PageID##pp. 2978-2979, 2987-2991; Transcript, RE.54, PageID##2678-*

*2679.*  Furthermore, attacking the findings of both the NIH and CSU is to be

expected when those findings are unfounded, but are deployed as pre-texts to strip

him of tenure and fire him despite their lack of substance.

   And Pesta has not argued that his misconduct should be overlooked.  He has

argued that there was no misconduct, period – because a technical infraction such

as use of the Dutch server cannot be misconduct on his part if it is honest error on

the part CSU's Office of Research Integrity.

## III.  THERE IS NO EVIDENCE, INCLUDING THE AFTER-ACQUIRED EVIDENCE, THAT DEMONSTRATES THAT A REASONABLE FACT-FINDER WOULD HAVE REACHED THE SAME CONCLUSION AND INVESTIGATED AND THEN TERMINATED PESTA.

After-acquired evidence is a bar to certain damages or relief, not a defense to liability. *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362-63 (1995). Furthermore, even its use as a limitation on damages would involve the court in making factual determinations.   *Stout v. Berry Ins. Group*, S.D.Ohio No. 1:17-CV-155, 2021 WL 3634711, *7–8.

Tacitly bypassing Pesta's objection, the lower court appears to have considered this evidence in some manner, though the weight it accorded such evidence is vague. *Order, RE.73, PageID##3966.*

Nevertheless, the evidence was not only improper at the liability stage, it was immaterial: even if Pesta had considered lying to the NIH at some point (and perhaps we might ask why some researchers would ever be tempted with lying), in the end, he did not lie to the NIH because he disclosed his intent to do the study that resulted in "Global Ancestry" with the Third Request.  *Transcript, RE. 56, PageID #2991; Final Report, RE. 38-5, PageID##948, 950.*  No genuine issue of material fact remains in light of the admissions that the Third Request permitted Pesta to do the research.  (*e.g. Yancey v. Carroll County, Ky*., 876 F.2d 1238, 1244(6th Cir. 1989): the district court correctly determined that there were no

genuine issues of material fact, regardless of whether or not later evidence showed there had been a false statement.)

Furthermore, we note that Pesta did not concede that he attempted to lie to the NIH.  To the contrary, the very deposition pages cited by Appellees make clear that "nothing was hidden."  *Transcript, RE. 38, PageID#732.*

## IV.   PESTA WAS ENTITLED TO SUMMARY JUDGMENT IN LIGHT OF APPELLEES' CONCESSIONS AND THE DECLARATORY CAUSE OF ACTION  SHOULD BE  REINSTATED.

Once the flawed administrative record and its findings are swept aside, FRCP 56 renders judgment in Pesta's favor appropriate.  Appellees Mallett, McLennan and Regoeczi did not even submit an affidavit challenging the evidence of their unlawful animus.  *Brief, RE. 44, PageID##pp. 1467-1482, 1488-1497, and Brief, RE. 64, PageID#3832-3846; Cf. RE.47and RE.50, and RE.72.*  As for Appellees Ward and Bloomberg, such evidence they did submit should count as no more than a scintilla: at no point did they adequately explain their numerous deviations from the Misconduct Policy, nor did they ever attempt to meet Pesta's proof on the farcical nature of the five findings they relied on to strip his tenure and fire him; nor did they challenge the evidence of their own animus against Pesta's hereditarian research. *Affidavit, RE.47-1, PageID1602-1605 and Affidavit, RE. 47-2, PageID#1610-1613.*

No one countenances and commits numerous deviations from a Misconduct Policy *en route* to upholding farcical findings if they are acting in good faith; and in any event there is no assertion from any Appellees squarely attesting to their good

faith.  *Cf. Affidavit, RE. 47-1, PageID1602-1605; and Affidavit, RE. 47-2, PageID#1610-1613.*

Regarding Appellee Sands, no argument was made on his behalf whatsoever.  *Cf. Brief, RE. 47 and Brief, RE., RE. 50 and Brief, RE. 72.*

The declaratory count, too, was improperly dismissed.  The only argument Appellees made against it was dropped into a footnote, which asserts that the declaratory account is wholly derivative of Pesta's first two counts.  *Brief, RE. 47, p. 1 at No. 2.*  This is error, but in any event if either of the first two accounts stand, so should the declaratory relief.

## VII.   CONCLUSION

"Live not by lies," said Solzhenitsyn.  It is a lie to say that we do not see racial differences in intelligence (*e.g. Deposition Exhibit, RE.54-1, PageID#2738*); and it is a lie that we only suspect environmental causes to account for such differences.  And damn any state actors who would force lies upon us by abusing obscure regulations.

For the reasons stated, this Court should reverse the district court's judgment, hold that the administrative record manifestly failed to establish any research misconduct on the part of Dr. Pesta and cannot be considered as justification for stripping Pesta of tenure and firing him, enter judgment on liability against all Appellees, reinstate Pesta's third cause of action for declaratory relief,

and remand the case with instructions for further proceedings consistent with this

Court's opinion.

/s/ Frederick C. Kelly, III
Frederick C. Kelly, III
LAW OFFICES OF FREDERICK C. KELLY
One Harriman Square
Goshen, NY 10924
(845) 294-7945

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains <u>12,303</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(f) and 6 Cir. R. 32(b)(1).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word</u> in <u>14-point Times New Roman</u>.

Dated: January 15, 2025

/s/ Frederick C. Kelly, III

Frederick C. Kelly, III

LAW OFFICES OF FREDERICK C. KELLY

One Harriman Square

Goshen, NY 10924

(845) 294-7945

*Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on January 15, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all CM/ECF users.

Dated: January 15, 2025

/s/ Frederick C. Kelly, III
Frederick C. Kelly, III
LAW OFFICES OF FREDERICK C. KELLY
One Harriman Square
Goshen, NY 10924
(845) 294-7945

*Counsel for Appellant*

## ADDENDUM
## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Docket Entry No. | Description | Page ID No. |
|---|---|---|
| RE. 38 | Transcript | 681; 684; 732 |
| RE. 38-3 | "Global Ancestry" paper | 752 |
| RE. 38-5 | CSU Final Report | 796; 798-799; 800-802; 806-809; 811-812; 814-816; 828; 831; 843-844; 847-864; 869-870; 873-874; 879-882; 899-903; 923; 925-927; 946-964 |
| RE. 38-8 | NIH Best Practices Form | 981 |
| RE. 38-9 | Second Request | 990-991; 995 |
| RE. 38-11 | Renewal for Second Request | 1010 |
| RE. 38-12 | Third Request | 1019-1029 |
| RE. 38-13 | Renewal for Third Request | 1036 |
| RE. 38-24 | Termination Letter | 1108-1109 |
| RE. 38-31 | Misconduct Policy | 1162-1188 |
| RE. 38-35 | Email | 1212-1216 |
| RE. 38-38 | Email | 1225 |
| RE. 44 | Brief | 1467-1482; 1488-1497 |
| RE. 45 | Expert Affidavit | 1510; 1512-1513 at ¶23; |
| RE. 45-1 | Expert Report | 1533-1537 |
| RE. 46 | Affidavit | 1543 |
| RE. 46-1 | NIH Email 9/19/19 | 1544 |
| RE. 46-2 | Pesta Email 9/20/19 | 1548-1551 |
| RE. 46-3 | Pesta Appeal of NIH Findings | 1554-1558 |
| RE. 47 | Brief | 1584 |
| RE. 47-1 | Affidavit | 1602-1605 |
| RE. 47-2 | Affidavit | 1610-1613 |
| RE. 50 | Brief | 1752 |
| RE. 52 | Transcript | 1903-1921 |

| RE. 53 | Transcript | 2129-2130; 2133-2134; 2142-2146; 2181-2184; 2215-2216; 2226-2229; 2249; 2260-2261; 2264-2265; 2267-2268; 2278-2282; 2324; 2326-2231; 2332-2333; 2358-2360; 2372-2373; 2386-2387; 2395 |
|---|---|---|
| RE. 53-2 | Deposition Exhibit | 2527-2531 |
| RE. 54 | Transcript | 2607-2610; 2619-2628; 2631; 2651-2652; 2660-2663; 2673-2674; 2678-2679-2680 |
| RE. 54-1 | Deposition Exhibit | 2738 |
| RE. 55 | Transcript | 2757; 2760-2761; 2763; 2768-2774 |
| RE. 56 | Transcript | 2819; 2821-2822; 2827-2828; 2834-2835; 2842-2845; 2849; 2855-2857; 2860-2863; 2865-2870; 2872-2874; 2876-2878; 2880-2887; 2895-2896; 2899-2900-2902; 2904-2905; 2916-2917; 2933-2934; 2937; 2939-2947; 2957-2959; 2961-2968; 2978-2979; 2987-2991; 2895-2896; 2901-2902; 2916-2917; 2919-2920; 2922-2923; 2963-2965; 2977; 2991 |
| RE. 56-2 | Deposition Exhibit | 3068 |
| RE. 57 | Transcript | 3107-3108; 3128-3130; 3138-3145; 3166; 3238 |
| RE. 57-1 | Deposition Exhibit | 3294-3295 |
| RE. 57-2 | Deposition Exhibit | 3296 |

| RE. 63 | Transcript | 3636; 3648-3652; 3659-3660; 3662-3663; 3648-3649; 3672-3673; 3675-3678; 3684-3690; 3705-3714; 3717-3727; 3742-3743 |
|---|---|---|
| RE. 63-1 | Deposition Exhibit | 3798 |
| RE. 63-2 | Deposition Exhibit | 3801-3806 |
| RE. 63-3 | Provost Memo | 3807-3808 |
| RE. 64 | Brief | 3811-3812; 3817-3846 |
| RE. 64-1 | Affidavit | 3851-3854; 3863-3864; |
| RE. 64-2 | CSU Conflict of Interest Policy | 3868-3869; 3870; 3873; |
| RE. 72 | Brief | 3951-3962 |
| RE. 73 | Order | 3963-3975 |
|  |  |  |