No. 24-3947

---

# In the United States Court of Appeals
# for the Sixth Circuit

BRYAN PESTA,

*Plaintiff - Appellant,*

v.

CLEVELAND STATE UNIVERSITY, ET. AL.,

*Defendants - Appellees.*

---

On Appeal from the United States District Court
for the Northern District of Ohio
No. 1:23-cv-00546
Hon. Dan A. Polster

---

## APPELLEES' BRIEF

---

Karen L. Giffen (0042663)
Kerin Lyn Kaminski (0013522)
Perez & Morris, LLC
1300 East Ninth Street, Suite 1600
Cleveland, Ohio 44114
216-621-5161
kgiffen@perez-morris.com
kkaminski@perez-morris.com

*Attorney for Defendants - Appellees*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................................................. i

TABLE OF AUTHORITIES ................................................... iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT .........................vii

APPELLEE'S BRIEF ............................................................. 1

   STATEMENT OF THE ISSUES ......................................... 1

   STATEMENT OF THE CASE ........................................... 1

     I.  Summary of Positions, Arguments and Rulings ........................ 1

     II.  The Uncontroverted Facts .......................................... 4

        A.  Pesta's Promotions at CSU and his Prior Research Involving Race/Ancestry and Intelligence ............................... 5

        B.  The NIH and Controlled Access Data ...................................... 6

        C.  The Global Ancestry Paper ........................................ 8

        D.  Pesta's Misleading Data Requests to the NIH and His Reports Hiding the Global Ancestry Paper ............................ 14

        E.  NIH Investigates and Finds Severe Violations. ....................... 21

        F.  Pesta Fully Participates in CSU's Investigation. .................... 24

        G.  Post Termination Confirmation of Pesta's Research Misconduct. ................................................................ 32

   SUMMARY OF THE ARGUMENT ................................................ 33

   ARGUMENT ...................................................................... 35

     I.  THE STANDARD OF REVIEW IS DE NOVO. .......................... 35

     II.  THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT DISMISSING PESTA'S FIRST AMENDMENT RETALIATION CLAIMS BECAUSE PESTA WAS FIRED FOR RESEARCH MISCONDUCT AND NOT IN RETALIATION FOR PROTECTED SPEECH. .......................................... 36

A.  Pesta, as a Public Employee, Has No First Amendment Protection for Speech that Relates to his Inaccurate, Dishonest or Incomplete Statements to the NIH Pursuant to his Official Duties. ................................. 37

B.  The District Court Correctly Determined There is no Genuine Dispute of Material Fact that Speech (the Global Ancestry Paper) was NOT a Proximate Cause of Pesta's Termination. ............................................. 38

C.  The Content of the Global Ancestry Paper was NOT a Substantial or Motivating Factor Behind Pesta's Termination ................................................................................. 39

    1.  There is no temporal proximity. ............................................ 40

    2.  There is a legitimate intervening non-retaliatory reason for the termination. ..................................................... 41

    3.  There is no direct evidence of retaliation. ............................ 43

D.  Summary Judgment Should be Affirmed Because the Evidence Demonstrates that Pesta Would Have Been Terminated for Research Misconduct Regardless of the Content of his Paper. ......................................................... 44

E.  The District Court did not Err and Fail to Conduct its Own Review of the Record. ..................................................... 47

F.  The District Court Did Not Err and There is No "After Acquired Evidence". ...................................................... 50

III.  SUMMARY JUDGMENT SHOULD BE AFFIRMED BECAUSE APELLEES HAVE QUALIFIED IMMUNITY. ....... 52

IV.  THE DISTRICT COURT CORRECTLY DISMISSED THE DECLARATORY JUDGMENT COUNT BECAUSE IT FAILS TO SET FORTH A CASE OR CONTROVERSY. ........................................................................ 56

CONCLUSION ................................................................................. 57

CERTIFICATE OF COMPLIANCE ...................................................... 58

CERTIFICATE OF SERVICE ............................................................. 59

ADDENDUM .......................................................................... 60

# Table of Authorities

Page

**Cases:**

*Akers v. Cnty. of Bell*
498 F. App'x 483 (6th Cir. 2012)  ....................................................... 45

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986)
[106 S. Ct. 2505, 2510]  .............................................................. 35

*Ashcroft v. al-Kidd*
563 U.S. 731 (2011)  ........................................................................ 53

*Bd. Of Curators of Univ. of Mo. V. Horowitz*
435 U.S. 78 (1978)  .......................................................................... 49

*Brennan v. Rhodes*
423 F.2d 706 (6th Cir. 1970)  ........................................................ 56

*Cir. - Cockrel v. Shelby Cnty. Sch. Dist.*
270 F.3d 1036 (6th Cir. 2001)  ....................................................... 49

*Clark Cty. Sch. Dist. v. Breeden*
532 U.S. 268 (2001)
[121 S.Ct. 1508, 149 L.Ed.2d 509]  ........................................... 38, 40

*Dixon v. Gonzales*
481 F.3d 324 (6th Cir. 2007)  ........................................................ 40

*Doherty v. S. Coll. Of Optometry*
862 F.2d 570 (6th Cir. 1988)  ........................................................ 48

*Eckerman v. Tenn. Dep't of Safety*
636 F.3d 202 (6th Cir. 2010)  ........................................................ 44

*Edgar v. JAC Prods.*
443 F.3d 501 (6th Cir. 2006)  ........................................................ 51

*Fritz v. Charter Twp. of Comstock*
463 F. App'x 493 (6th Cir. 2012)  ................................................. 54

*Fuhr v. Hazel Park Sch. Dist.*
710 F.3d 668 (6th Cir. 2013)  ........................................................ 40

*Garcetti v. Ceballos*
   547 U.S. 410 (2006)
   [126 S. Ct. 1951, 164 L. Ed.2d 689] ........................................... 34, 37

*Greene v. Barber*
   310 F.3d 889 (6th Cir. 2002) ................................................... 39

*Grutter v. Bollinger*
   539 U.S. 306 (2003) ............................................................... 49

*Haji v. Columbus City Sch.*
   621 F. App'x 309 (6th Cir. 2015) ..................................... 45

*Harlow v. Fitzgerald*
   457 U.S. 800 (1982) ............................................................... 54

*Hayes v. Equitable Energy Res. Co.*
   266 F.3d 560 (6th Cir. 2001) ........................................... 53

*Holley v. Seminole Cnty. Sch. Dist*
   755 F.2d 1492 (11th Cir. 1985) ..................................... 49

*Holzemer v. City of Memphis*
   621 F.3d 512 (6th Cir. 2010) ........................................... 39

*J. B-K. by E.B. v. Sec'y of Ky. Cabinet for Health & Fam. Servs.*
   48 F.4th 721 (6th Cir. 2022) ........................................... 57

*Kennedy v Bremerton Sch. Dist.*
   597 U.S. 507 (2022) ............................................................... 37

*Kuhn v. Washtenaw Cnty.*
   709 F.3d 612 (6th Cir. 2013) ........................................... 41

*Leonard v. Robinson*
   477 F.3d 347 (6th Cir. 2007) ........................................... 39

*Malley v. Briggs*
   475 U.S. 335 (1986) ............................................................... 53

*McCue v. Bradstreet*
   807 F.3d 334 (1st Cir. 2015) ........................................... 45

*McElhaney v. Williams*
   81 F.4th 550 (6th Cir. 2023) ........................................... 54

*McKennon v. Nashville Banner Pub. Co.*
   513 U.S. 352 (1995) ..................................................... 50, 51

*Min Li v. Jiang*
673 F. App'x 470 (6th Cir. 2016) ...................................................... 45

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*
429 U.S. 274 (1977)
[97 S.Ct. 568, 50 L.Ed.2d 471] ............................................. 38, 39, 44

*Nailon v. Univ. of Cincinnati*
715 F. App'x 509 (6th Cir. 2017) ...................................................... 36

*Nguyen v City of Cleveland*
229 F.3d 559 (6th Cir. 2000) ...................................................... 39, 40

*Pearson v Callahan*
555 U.S. 223 (2009) ...................................................................... 53

*Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205*
391 U.S. 563 (1968)
[88 S. Ct. 1731, 20 L. Ed. 2d 811] ............................................. 34, 37

*Regents of Univ. of Michigan v. Ewing*
474 U.S. 214 (1985) ...................................................................... 48

*Rodgers v Banks*
344 F.3d 587 (6th Cir. 2003) ........................................................... 39

*Rudlaff v Gillispie*
791 F.3d 638 (6th Cir. 2015) ........................................................... 53

*Ruiz-Fane v. Tharp*
545 F. Supp. 3d 543 (N.D. Ohio 2021) ...................................... 41, 42

*Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.*
772 F.2d 214 (6th Cir. 1985) ........................................................... 53

*Savage v. Gee*
665 F.3d 732 (6th Cir. 2012) ........................................................... 36

*Sensabaugh v. Halliburton*
937 F.3d 621 (6th Cir. 2019) ........................................................... 39

*Shehee v. Luttrell*
199 F.3d 295 (6th Cir. 1999) ........................................................... 54

*Smith v. Campbell*
250 F.3d 1032 (6th Cir. 2001) ......................................................... 54

*TCI/TKR Cable v. Johnson*
30 F. App'x 581 (6th Cir. 2002) ...................................................... 56

*Thaddeus–X v. Blatter*
    175 F.3d 378 (6th Cir. 1999) ............................................................. 38

*Vereecke v Huron Valley Sch. Dist.*
    609 F.3d 392 (6th Cir. 2010) ............................................................. 44

*Wilmington Tr. Co. v. AEP Generating Co.*
    859 F.3d 365 (6th Cir. 2017) ............................................................. 35

*Yerkes v. Ohio State Highway Patrol*
    22–3030
    2022 U.S. App. LEXIS 35260 (6th Cir. Dec. 19, 2022) .................... 54

## Statutes:

28 U.S.C. § 2201 ..................................................................................... 56

Ohio Admin. Code § 3344–28–01 ......................................................... 47

Ohio Rev. Code § 3345.011 .................................................................... 5

## Constitutions:

U.S. Const., 1st Amend. ................................. 1, 33, 34, 36, 37, 38, 45, 54

## Court Rules:

Fed. R. Civ. P. 56 ................................................................................... 35

## Statement in Support of Oral Argument

The Appellees request Oral Argument to answer questions the Court may have regarding both the facts before the District Court and the legal arguments. This is a case of great importance to the academic world. Institutions of higher learning need a clear message that the First Amendment will not shield faculty members from the consequences of engaging in research misconduct, particularly, where, as here, the misconduct jeopardizes academic institutions' ability to conduct future research and important research funding.

Perez Morris

Respectfully submitted,

Dated: March 7, 2025          By: /s/ Karen Giffen
                                  _____

                                  *Attorney for*
                                  *Defendants - Appellees*

## Appellee's Brief

## STATEMENT OF THE ISSUES

1. Whether the District Court correctly granted summary judgment to Appellees on Appellant's First Amendment retaliation claims where Appellant was fired for research misconduct over two years after he published the allegedly protected speech and there was no evidence the termination was because of allegedly protected speech.

2. Whether the District Court's order granting summary judgment to the Appellees should be affirmed because Appellees have qualified immunity.

3. Whether the District Court correctly dismissed the declaratory judgment count because it fails to set forth a case or controversy.

## STATEMENT OF THE CASE

### I.  Summary of Positions, Arguments and Rulings

This case arises out of Cleveland State University's ("CSU") investigation and subsequent termination of Dr. Bryan Pesta ("Pesta") for engaging in research misconduct after the National Institutes of Health ("NIH") found that Pesta violated NIH rules and policies. Pesta asserts he was terminated in retaliation for exercising his rights under the First Amendment to the United States Constitution.

During the course of the litigation, Pesta brought claims directly against CSU, against the individually named Defendants in their official capacities, and against the members of the Board of Trustees of CSU. Those claims were dismissed by the District Court. Orders Granting Motion to Dismiss and Motion for Judgment on the Pleadings, RE 9 and RE 28. The dismissal of these claims has not been appealed.

The remaining Defendants are Harlan Sands, then President of CSU, Laura Bloomberg, then Provost of CSU, ("Provost Bloomberg"), and four individuals, Benjamin Ward, Christopher Mallett, Conor McLennan and Wendy Regoeczi, who served on or supported a committee formed by CSU to investigate Pesta's research misconduct each of whom are being sued in their individual capacities. (the "Investigative Committee")(collectively "Individual Defendants"). Amended Complaint, RE 18, Page ID# 297. It is the District Court's grant of the Individual Defendants' Motion for Summary Judgment that forms the basis for this Appeal. Order and Opinion Granting Summary Judgment, RE 73 and 74.

Pesta published a research paper entitled "Global Ancestry and Cognitive Ability" in August 2019 (the "Global Ancestry Paper") in which he and his coauthors contend that genetics plays a role in the mean differences in IQ scores between White and Black Americans. Amended Complaint, RE 18, Pages ID #300–329. Pesta claims that the Global Ancestry

Paper dealt with a controversial topic and the controversial content was the motivation for his dismissal from CSU. Amended Complaint, RE 18, Page ID# 317.

As set forth below, the Individual Defendants contend Pesta's employment was not terminated because of the content of the Global Ancestry Paper but, because Pesta engaged in serious research misconduct. Most of the research misconduct is admitted to by Pesta. The most egregious research misconduct was violating the rules established by the NIH for use of its data. The NIH found that Pesta had violated its rules and the agreements he signed with the NIH. Pesta Deposition Exhibit 5 ("CSU Final Report"), RE 38, Page ID# 810–813. Pesta failed to truthfully and completely disclose to the NIH and CSU the exact nature of the research that he intended to engage in and how he would conduct the research. CSU Final Report, RE 38, Page ID# 795–804. At every turn, Pesta attempted to mislead or avoid the scrutiny of the NIH and CSU and did so in breach of NIH and CSU policies and well recognized professional standards.

The record before the District Court demonstrates that Pesta was afforded substantial opportunities to present his facts and defenses to the allegations of misconduct and did present his defenses to the NIH (CSU Final Report, RE 38, Page ID# 810–817), the Investigative Committee (CSU Final Report, RE 38, Page ID# 795–804), the Provost of CSU (CSU Final Report, RE 38, Page ID# 957–964), a separate Ad Hoc Committee

of CSU faculty (Pesta Deposition, RE 38, Pages 708, 711), Pesta's union, the American Association of University Professors ("AAUP")(Pesta Deposition Exhibit 26, RE 38, Page ID# 1124–1144), and the Ohio State Employee Relations Board (Pesta Deposition Exhibit 30, RE 38, Pages ID#1160–1161).

Pesta was represented by counsel during each of these proceedings. Every committee, individual and entity rejected his arguments and found that he was properly terminated for research misconduct. The uncontroverted evidence shows that Pesta would have been terminated for his research misconduct no matter what the subject matter was of Pesta's research.

Motions for Summary Judgment were filed both by the Individual Defendants and by Pesta. Both Motions were fully briefed. Summary Judgment Briefing, RE 44, 47, 50, 64, 68, and 72. The District Court granted the Individual Defendants' Motion for Summary Judgment and denied Pesta's Motion. Opinion and Order, RE 73 and 74. Thereafter, Pesta filed this appeal. The factual record demonstrates that the District Court correctly granted summary judgment in favor of the Individual Defendants.

## II.  The Uncontroverted Facts

CSU is a public institution of higher education with approximately 14,000 students and 500 full time faculty members that offers more than 200 graduate and undergraduate programs in eight separate colleges.

ORC Section 3345.011; Bloomberg Affidavit, RE 47, Page ID# 1603. CSU is classified as a "High Research Activity" institution, which means research is integral to CSU's mission and that CSU fosters a conducive environment for inquiry and discovery. Bloomberg Affidavit, RE 47, Page ID# 1603. CSU has annual research and development expenditures of $55 million. Thus, the integrity of the research conducted at CSU is crucial to its educational mission and its reputation and standing in the academic community. Bloomberg Affidavit, RE 47, Page ID# 1603.

## A. Pesta's Promotions at CSU and his Prior Research Involving Race/Ancestry and Intelligence

Pesta became an Assistant Professor of Management and Labor Relations at CSU's Monte Ahuja College of Business in 2001 and was granted tenure in 2010. He was promoted to Full Professor in 2016. Pesta Deposition, RE 38, Page ID# 665–667, Pesta Deposition Exhibit 1, RE 38, Page ID#743.

Pesta testified that at the time he was awarded tenure and promoted to Full Professor, his superiors wanted him to publish research papers. Pesta Deposition, RE 38, Page ID# 666–667. Pesta's applications for tenure and promotion required Pesta to submit a list of his then existing research publications. Pesta Deposition, RE 38, Page ID# 667–670, Pesta Deposition Exhibit 1, RE 38, Page ID# 743.

The list of published works provided by Pesta to CSU to obtain tenure and promotion demonstrate that the Global Ancestry Paper was not Pesta's first foray into researching the relationship between intelligence and race/ancestry. Pesta testified that he began to publish in the intelligence and race/ancestry area in 2008 **before** he was awarded tenure and **before** he was promoted at CSU. Pesta Deposition, RE 38, Page ID# 667–671, Pesta Deposition Exhibit 1, RE 38, Page ID# 743. Of the thirteen papers Pesta published before being promoted to Full Professor, nine relate to intelligence and race/ancestry or some other subgroup. *Id.* Thus, CSU was aware of his interest in researching and publishing papers regarding intelligence and race/ancestry before he was granted tenure and promoted. Pesta Deposition, RE 38, Page ID# 671. The fact that Pesta was given tenure and then promoted after CSU knew of his interest in the exact subject matter that he now claims is the basis for his dismissal is strong evidence that CSU did not terminate him for the subject matter of his paper.

## B.   The NIH and Controlled Access Data

Understanding the role of NIH is fundamental to understanding this dispute. The NIH provides and protects access to certain data it maintains and ensures such data is used consistently with the consent given by the participants in the study that generated the data ("Controlled Access Data"). Oakes Report, PE 50, Page ID# 1814–1826. Because the NIH

has total control of Controlled Access Data, only the NIH can determine the circumstances under which access to the data will be granted and to whom. The NIH requires that access to Controlled Access Data be limited to academic institutions and Principal Investigators who are associated with those institutions. Oakes Report, PE 50, Page ID# 1814–1826.

Under NIH requirements, Pesta was the Principal Investigator for the research that led to publication of the Global Ancestry paper. As such, it is undisputed that he had the primary responsibility to ensure that the research was conducted in compliance with applicable laws, regulations, policies, and agreements. Pesta Deposition, RE 38, Page ID#681–682, Oakes Report, PE 50, Page ID# 1819–1820.

The NIH requires that to obtain Controlled Access Data, the Principal Investigator (here Pesta) must comply with certain requirements, including (1) requesting use of the Controlled Access Data through submission of a Data Access Request ("Data Request") that fully discloses the purpose of the research, (2) submission of timely reports and a timely renewal to use the Controlled Access Data for a longer period if needed, (3) entering into the Data Use Certification Agreement that sets forth the terms of the use of the Controlled Access Data ("Data Use Agreement"), and (4) a promise to adhere to various best practices outlined by the NIH. Oakes Report, RE 50, Page ID# 1820–1826, CSU Final Report, RE 38, Page ID# 929 and 935, Pesta Deposition Exhibit 9, RE 38, Page ID# 994–1001.

The NIH Controlled Access Data used to develop the Global Ancestry Paper is known as the Trajectories of Complex Phenotypes study ("TCP data"). The TCP data is based on a large-scale study of child development that combines neuroimaging, diverse clinical and cognitive phenotypes, and genomics of approximately 10,000 children aged 8–21 in Philadelphia. The TCP data is available only through the NIH. Pesta Deposition, RE 38, Page ID# 688, Oakes Report, RE 50, Page ID# 1820–1826.

Once the NIH agrees to provide someone the right to use Controlled Access Data, the parties sign the Data Use Agreement. The parties to the Data Use Agreement are the Principal Investigator (Pesta), his home institution (CSU), and the NIH. Pesta Deposition Exhibit 9, RE 38, Page ID# 994–1001. The Data Use Agreement provides that "[r]esearch use will occur solely in connection with the research project described in the Data Request, which includes a 1–2 paragraph description of the research objectives and design." Pesta Deposition Exhibit 9, RE 38, Page ID# 994.

### C.   The Global Ancestry Paper

The Global Ancestry Paper was published in the open-source journal Psych on August 30, 2019. At the time it was published, Pesta was the editor of Psych. Pesta Deposition, RE 38, Page ID# 672–674, Pesta Deposition Exhibit 3, RE 38, Page ID#752, Oakes Report, RE 50, Page ID# 1836. The coauthors of the Global Ancestry Paper with Pesta were John

Fuerst ("Fuerst"), Emile Kirkegaard ("Kirkegaard"), and Jordan Lasker. Pesta Deposition Exhibit 3, RE 38, Page ID# 752. Of the coauthors, only Pesta has a doctoral degree. Pesta Deposition, RE 38, Page 702. Only Pesta was associated with an institution to which the NIH would provide Controlled Access Data. Pesta Deposition, RE 38, Page ID# 687, 697,702, 725–726, 735. Thus, the co-authors needed Pesta to gain access to the TCP data. None of the co-authors of the Global Analysis Paper had any prior experience obtaining Controlled Access Data, like the TCP data, from NIH. Pesta Deposition, RE 38, Page ID# 735.

The genesis of the Global Ancestry research project began at a meeting Pesta had with Fuerst in 2018. Pesta Deposition, RE 38, Page ID# 721–722. After their first meeting, Fuerst wrote to Pesta, at Pesta's CSU's email address, telling him how to request Controlled Access Data from NIH. Again, neither Fuerst nor Kirkegaard had prior experience getting Controlled Access Data from NIH, yet Pesta appears to have relied upon them to write the proposals to the NIH. Pesta Deposition Exhibit 35, RE 38, Page ID# 1212; Pesta Deposition, RE 38, Page ID# 697, 721, 735.

To begin the work with Fuerst, CSU granted Pesta's request for a paid sabbatical to engage in the research required to publish the Global Ancestry Paper. Pesta Deposition, RE 38, Page ID# 675–676 and Pesta De-

position Exhibit 4, RE 38, Page ID# 781–787. In his application for the sabbatical, Pesta was, unlike his later requests to the NIH, clear regarding what he intended to research. Pesta wrote in his application:

> ***The research question we want to address is why some people (and groups of people) are smarter than others****. … **This technique essentially estimates a person's ancestry in terms of percentages across various ancestral groups**. The next step would be to see if these ancestry estimates predict cognitive ability.

Pesta Deposition, RE 38, Page ID# 676 and Pesta Deposition Exhibit 4, RE 38, Page ID# 786 (emphasis added). Pesta was granted the requested six-month paid sabbatical to do the research on the exact subject which Pesta now claims was the basis for his dismissal. Pesta concedes that while getting his paid sabbatical approved, no one from CSU questioned the subject matter of his intended research. Pesta Deposition, RE 38, Page ID# 676. This is further evidence that CSU had no subject matter bias regarding his research.

Pesta also devised an unusual scheme to allow Fuerst access to the TCP data. Usually, research assistants are enrolled in a course of study at CSU. Fuerst was not so enrolled. He was only at CSU as a non-degree student in a one-credit independent study class that was solely under Pesta's direct supervision. Fuerst re-enrolled in the same independent study with Pesta five consecutive semesters from spring 2019 to spring

10

2021. Fuerst took no actual classes at CSU and neither applied for nor was accepted to any degree program. CSU Final Report, RE 38, Page ID# 960–962.

After Fuerst described to Pesta the research he and Kirkegaard wanted to do, Fuerst told Pesta:

> I attached a proposal – nominally to test for sex differences in relation to brain differences in which a control for population structure would be included – above. This would represent a genuinely interesting replication study & ***a sneaky*** way to request and possibly present the ancestry x cognitive outcome data.

Pesta Deposition Exhibit 38, RE 38, Page ID# 1225 (emphasis added). That Pesta and his cohorts were motivated to mislead the NIH and be "sneaky" to hide the true nature of their research is expressed in other emails and by their actions. Kirkegaard wrote to Pesta on April 12, 2018, immediately after Pesta told Kirkegaard and Fuerst that the first request for Controlled Access Data to the NIH was made by saying "the deed is done". Pesta Deposition, RE 38, Page ID# 732 and Pesta Deposition Exhibit 38, RE 38, Page ID# 1225. Kirkegaard said:

> Cool. We may want to send some applications for other samples as soon as possible to see how difficult the [Internal Review Board] is to get. I reckon that if ***we mask the nature of the study with usual medical terms, one can get away with a lot***.

11

> Getting samples for analyses that one doesn't publish (to pre-
> serve your reputation) are still useful because they allow us
> ***to validate our beliefs privately***, which is useful because it
> will tell us how confident one can push ideas in other papers.

Pesta responded to Kirkegaard, "**Good idea**, Do we wait for any feed-back on this one, or just march on? **I would obviously need you guys to do the write-ups again**." At the end of this email exchange in April 2018, Pesta told Kirkegaard and Fuerst, "Let's switch discussion to the above/non-school email." Pesta Deposition Exhibit 38, RE 38, Pages ID# 1225–1226 (emphasis added). Pesta did not produce any emails from his home email address relating to this discussion and claims that he has none.

Thus, the undisputed evidence shows in their own words that Pesta, Kirkegaard and Fuerst did not have a goal to be truthful and transparent in their communication with the NIH about why they wanted the Controlled Access Data. They wanted to be "sneaky" and to "mask the true nature of the study." These references show that the Global Ancestry Paper coauthors intentionally misled the NIH and were aware of their malfeasance. This is not honest error as Pesta now asserts.

The Global Ancestry Paper was not the only time Pesta and Fuerst were willing to mislead the NIH on the nature of their intended research. On June 4, 2020, Dr. Russell Warne[1], another researcher on this subject, wrote to Pesta to say:

> Bryan,
>
> I'm writing to make a request that is very important. I need [you to] remove my name from the genomics manuscript that was resubmitted to Intelligence.
>
> There are two reasons for this. The first is personal. If some-one found out that I was an [author] of the study, then the effects could be drastically negative for me. ***Even if our actions comply with the letter, but violate the spirit of the data access agreements, the risk of negative consequences would still be too great. I'm not sure that tenure would protect me from consequences of violating the data use agreement, and I have a family to worry abou****t. . ..*

Warne Deposition Exhibit 12, RE 42, Page ID# 1445–1457 (emphasis added). Pesta and Fuerst refused to take Warne's name off the referenced paper until after it had been resubmitted to the scientific journal. Thus, once again, their actions were "sneaky."

---

[1]   Dr. Warne is also the individual whom Pesta has declared as an expert in support of his case. He opines solely on the scientific validity of the Global Ancestry paper itself, an issue that is not relevant to resolving the instant dispute and therefore he is not an expert in this case.

### D. Pesta's Misleading Data Requests to the NIH and His Reports Hiding the Global Ancestry Paper

Against this background of Pesta and his co-authors intentions to hide the true nature of their research from the NIH, Pesta, as Principal Investigator made three Data Requests to access the TCP Controlled Data. Unlike the sabbatical request Pesta submitted to CSU, none of the Data Requests disclosed in clear terms what analysis was to be done using the data or what was ultimately published but, not properly reported to the NIH, in the Global Ancestry Paper.

The Data Use Agreement signed by Pesta provided that access to the TCP data was granted for only one year unless a renewal was requested. The Data Use Agreement stated:

> To assure that NIH policies and procedures for genomic data use are adhered to, Approved Users agree to provide to the NIMH Data Access Committee annual feedback on how these data have been used and ***any results that have been generated as a result of access to the data, including patents and publications***. . .
>
> Annual Data Use Reports will provide information regarding potentially significant findings and publications or presentations that resulted from the use of the requested dataset(s), a summary of an plans for future research use, . . ..

Pesta Depositions Exhibits 7, 9 ,11, 12, 13, and 14, RE 38, Page ID# 966-980, 990-1001, 1004-1018, 1019-1029, 1030-1044 and 10450-1047 (emphasis added).

Pesta's first Data Request for the TCP data was made on April 12, 2018. This Data Request stated that the TCP data would be used to investigate sex difference. ("Sex Differences Request"). Pesta Deposition, RE 38, Page ID# 681, Pesta Deposition Exhibit 7, RE 38, Page ID# 966–968. No mention of studying intelligence and race/ancestry is made in this Sex Differences Request. Pesta Deposition Exhibit 7, RE 38, Page ID# 966, Oakes Report, RE 50, Pages ID# 1826–1827. Pesta admits that there was no research and no publication relating to the Sex Differences Request and the project was closed out with the NIH on June 28, 2019. Pesta Deposition, RE 38, Page ID# 683, 690.

On July 15, 2018, while the TCP data was still available to Pesta under the Sex Differences Request, he submitted his second Data Request, and it again does not mention that intelligence and race/ancestry was the purpose for obtaining the data. ("Mental Health Request") Pesta Deposition Exhibit 9, RE 38, Page ID# 990–993, Oakes Report, RE 50, Page ID# 1828–1829. The Mental Health Request states that the purpose for obtaining the data was:

> In the USA, diagnosis rates for different mental disorders (e.g. schizophrenia, depression) vary across ethnic groups. … Specifically, I will employ admixture analysis to determine if global ancestry predicts mental health outcomes.

Pesta Deposition Exhibit 9, RE 38, Page ID# 991.

On August 29, 2019, as required under his Mental Health Request Data Use Agreement, Pesta requested a renewal to continue to use the TCP data. Pesta Deposition Exhibit 11, RE 38, Page ID#1004–1007. Pesta submitted the Global Ancestry Paper for publication in the journal he edited, Psych, on June 8, 2019 (long before his renewal application). Pesta Deposition Exhibit 3, RE 38, Page ID#752. In his application to renew the Mental Health Request, Pesta makes no mention of the Global Ancestry Paper that was due to be published, one day after Pesta submitted his renewal request to the NIH, in a journal for which he was the editor (obviously he knew when it was to be published). Pesta Deposition Exhibit 11, RE 38, Page ID# 1004–1007. Pesta argues that he did not have to report the Global Ancestry Paper when he submitted the renewal request because it was not due to be published until the day after his report. This ignores the facts and purpose of the reporting. It ignores the directive of the NIH to report feedback on how the data has been used and *any results that have been generated as a result of access to the data, including patents and publications. . .*" Pesta Deposition Exhibits 7, 9, 14, RE 38, Page ID# 966, 990, 1045, Oakes Report, RE 50, Page ID# 1836–37, 1848–1851(emphasis added). As demonstrated by the publication date of the Global Ancestry Paper, while using the data received under the Mental Health Request, the data was analyzed for and used in a paper with a completely different purpose (intelligence and race/ancestry). Oakes Report, RE 50, Page ID# 1848–1851.

16

While the Mental Health Request was still open, on September 19, 2018, Pesta put in a third Data Request for the same TCP data. Pesta Deposition Exhibit 12, RE 38, Page ID# 1019–1021. This third Data Request states that the purpose for obtaining the data is:

> Several recent studies have constructed polygenic scores (PGS) for various traits. Examples include education attainment and schizophrenia. . .. We propose to research the effect of PGS construction on the transethnic validity of PGS for two traits: education attainment and schizophrenia.

("Effect of PGS Request"). Pesta Deposition Exhibit 12, RE 38, Page ID# 786, Oakes Report, RE 50, Page ID# 1830–1831. Pesta claims the Effect of PGS Request satisfied NIH requirements despite the NIH determining it did not. The Effect of PGS Data Request still did not state that the goal was to use the data to determine why some groups of people are smarter than others and to look at the impact of race/ancestry on intelligence. Pesta Deposition Exhibit 4, RE 38. Page ID# 786. It does not cover the actual research reported in the Global Ancestry Ppaper. Oakes Report, RE 50, Page ID# 1832–1834, 1836–1837, 1848–185. Pesta has offered no explanation as to why his Data Requests to the NIH, including this third Data Request, do not state the subject of his research as clearly as his sabbatical request to CSU. The only possible explanation is that

Pesta and his coauthors did not want the NIH to know the real subject matter. Again, this explanation is logically inferred from Pesta's private exchanges with his coauthors about being "sneaky" with the NIH.

Moreover, Pesta did not even report the Global Ancestry Paper when he made the renewal report for the Effect of PGS Request months later on December 3, 2019. Pesta Deposition, RE 38, Page ID# 691–692. The Global Ancestry Paper was published over three months prior to this renewal request and thus should have been disclosed if it was published using access granted under this request.

On August 31, 2020, a year after publication, Pesta finally and for the only time reported to the NIH how he actually used the TCP data, namely, - the Global Ancestry Paper under the Mental Health Data Request. Oakes Report, RE 50, Page ID# 1836–1837, Pesta Deposition, RE 38, Page ID# 691–692, Pesta Deposition Exhibit 10, RE 38, Page ID# 1002. Of course, the Global Ancestry Paper had nothing to do with the mental health purpose set forth in the Mental Health Request and the Mental Health Request was never amended or corrected to include the purpose for which the data was used in the Global Ancestry paper. Pesta Deposition Exhibit 10, RE 38, Page ID# 1002, Oakes Report, RE 50, Page ID# 1836–1837, 1843–1844, 1848–1851.

As made clear by the NIH in its Data Requests and Data Use Agreements, the entire goal of the NIH is to know **how** the Controlled Access Data it provides is being used and **what research** is published as a re-

sult. As found by the NIH and confirmed by CSU, those goals were not met by Pesta's Data Requests or any of the subsequent reporting done by Pesta. Importantly, all the Data Requests submitted by Pesta stated that the TCP data would be used, ***but none of them*** specifically disclosed that a genetic basis for the relationship between intelligence and race/ancestry was the primary research topic. Oakes Report, RE 50, Page ID# 1832–1834, 1836–1837, 1848–1851.

Pesta argues in his Appellate Brief that Dr. Benjamin Ward, who supported the Investigative Committee in their efforts, admitted that Pesta was cleared to research whether there was a genetic basis for racial differences in intelligence by Pesta's Effect of PGS Request. Pesta Appellate Brief at Page 9. There was no such admission. All Dr. Ward said in his testimony was that Pesta was cleared to use the TCP Data consistently with what was stated in the Effect of PGS Request. Ward Deposition, RE 56, Page ID# 2991. As noted above, that Data Request did not specifically disclose that the primary research topic was the genetic basis for the relationship between intelligence and race/ancestry. Further, Ward's opinion on this discreet point is simply irrelevant to whether there was research misconduct and whether the Provost decided to terminate Pesta because of the research misconduct she found.

Consistent with his email communications with Kirkegaard and Fuerst, Pesta did not tell NIH he was interested in studying intelligence and race/ancestry in any of his Data Requests to NIH. Pesta Deposition

Exhibits 7, 9, 14, RE 38, Page ID# 966, 990, 1045. And we know from Pesta's sabbatical request, he was capable of stating the purpose clearly when he was not trying to be "sneaky." Indeed, the only research and publication using the TCP data completed by Pesta was the analysis performed for the Global Ancestry Paper.

In addition to the serious efforts to hide the research evidenced by these repeated reporting errors, Pesta also violated the Data Use Agreement by providing access to the TCP data to people the NIH did not approve to have access. Pesta and his co-authors wanted to get more information on the skin color, eye color, and hair texture of the participants that generated the TCP data. To do so, they needed to do what is known as phenotyping, but they were unable to complete this analysis themselves. Pesta Deposition, RE 38, Page ID# 688–691. So, without the permission of NIH, Pesta uploaded the controlled-access TCP data to an online website outside the United States that performed phenotyping services. This sharing of the TCP data was not disclosed to NIH. Final Report, RE 38, Page ID# 810–817. Pesta admits this sharing of the TCP data was wrong. Pesta Deposition, RE 38, Page ID# 706. The Data Use Agreement makes quite clear that transfers of data to unauthorized users is prohibited. Pesta Deposition Exhibits 7, 9 and 14, RE 38, Page ID# 966, 990, 1045, Oakes Report, RE 50, 1843–1844.

While admitting this breach of the Data Use Agreement, Pesta claims in his Brief that the infraction was "obscure" or merely "technical." This

argument is made without any citation to the record and represents nothing more than Pesta's own self-serving non-expert opinion. The argument is also belied by the actual expert opinions of Dr. Oakes and the NIH.

### E.  NIH Investigates and Finds Severe Violations.

On September 19, 2019, the NIH wrote Pesta (and copied CSU) questioning his use of the TCP data. The questions posed by the NIH included a request for Pesta to explain how his use of the TCP data in the Global Ancestry Paper was consistent with his Data Requests to the NIH and whether he had properly disclosed his collaborators to the NIH. CSU Final Report, RE 38, Page ID# 810–813. Pesta responded to the NIH inquiry and also filed an appeal. CSU Final Report, RE 38, Page ID# 814–817.

After the initial notice from the NIH, CSU was contacted by Kevin Bird, Jedidiah Carlson, Cathryn Townsend, Os Keyes, and Kent Taylor. None of these people were connected to CSU. Each of them complained about Pesta's research generally and about his acquisition and use of the TCP data. CSU Final Report, RE 38, Page ID# 808–809. CSU took no action on these outside complaints primarily because the NIH was investigating, and the NIH was in the best position to determine whether its

rules and agreements had been violated. Motion for Summary Judgment Exhibit 1, RE 47, Page ID# 1604, Motion for Summary Judgment Exhibit 2, RE 47, Page ID# 1612.

On May 17, 2021, the NIH sent a letter to both Pesta and CSU that it had completed its investigation and found that Pesta had violated NIH agreements and policies in three ways:

1. Pesta's Data Requests were for studies of mental health outcomes, not intelligence;
2. The TCP data was shared with an unapproved online forensic DNA phenotyping service; and
3. The Global Ancestry Paper was not properly reported at the time of project renewal.

CSU Final Report, RE 38, Page ID# 810–813. As a result of its findings, the NIH requested that CSU immediately destroy the TCP data, contact the online phenotyping service concerning their use of the data, and to describe how CSU was going to respond to the violations. CSU Final Report, RE 38, Page ID# 810–813. In accordance with NIH directives, CSU requested that Pesta destroy the TCP data or permit CSU to control segregation of the data. Pesta Deposition Exhibit 15, RE 38, Page ID# 1048–1053. On June 24, 2021, Pesta informed CSU that the TCP data was not housed on a CSU server but rather on a stand-alone personal computer in his home. Pesta Deposition Exhibit 15, RE 38, Page ID#

1048–1053. This was the first time CSU was aware that Pesta had stored the TCP data on his home computer because Pesta had sneakily reported to CSU only that:

> Conversely, I will be the only one who has access to data files which are restricted access, including genotypic data. I will store these data on my CSU computer only, which is password and firewall protected. Finally, I will destroy the restricted data after the analysis is completed.

Pesta Deposition Exhibit 15, RE 38, Page ID# 1048–1053. Neither of these statements was true as Pesta stored the TCP data on his home computer and at minimum, Fuerst had access to the TCP data. Final Report, RE 38, Page ID# 795–804.

Pesta asked for more time to destroy or transfer the TCP data. Pesta Deposition Exhibit 16, RE 38, Page ID# 1054–1055. In the meantime, both Pesta and Ward attempted to contact Fuerst to get him to confirm whether he had any of the Controlled Access Data, whether the TCP data had been deleted from his computer systems, and to sign a certification to that effect. Fuerst took issue with the request and said the NIH had no right to request deletion of the TCP data. He refused to comply with the request by the deadline. Motion for Summary Judgment Exhibits 2 and 5, RE 47, Page ID# 1612 and 1623–1627. Pesta providing access to

the TCP data to Fuerst and Fuerst's refusal to confirm his deletion of the data are perfect examples of the problems created by Pesta's failure to control access to the data as required by the NIH.

On July 11, 2021, Pesta formally appealed the decision of NIH. He was represented by counsel in connection with the appeal. On August 17, 2021, the NIH denied the appeal. The NIH found the following violations:

1. Researching matters that were not described in Pesta's Data Request;
2. Sharing controlled access data with an unauthorized entity;
3. Failing to provide accurate annual reports; and
4. Fuerst's refusal to confirm destruction of the TCP data.

CSU Final Report, RE 38, Page ID# 814–817. The NIH concluded that each of the violations was serious and Pesta received a three-year suspension from access to controlled-access data sets, the most serious sanction ever meted out by the NIH. CSU Final Report, RE 38, Page ID# 814–817, Motion for Summary Judgment Exhibit 1, RE 27, Page ID# 1604.

### F.   Pesta Fully Participates in CSU's Investigation.

CSU's academic research misconduct policy is found at O.A.C., Chapter 3344–28–01, et. seq. Academic research misconduct is defined as "fabrication, falsification, plagiarism, undisclosed conflicts of interest as

defined in the policy for managing conflict of interest, or other practices that seriously deviate from those that are commonly accepted within the academic community for proposing, conducting or reporting research." It does not include honest error or honest differences in interpretations or judgments of data. OAC Sec. 3344–28–02(A).

Following the NIH decision, CSU informed Pesta of its initiation of a formal investigation and provided him with all the documents given to the Investigative Committee. Pesta Deposition, RE 38, Page ID# 677–679, CSU Final Report, RE 38, Page ID# 806–809. Pesta was permitted to communicate his facts, position, defenses and arguments to the Investigative Committee in every way he requested and he availed himself of that opportunity at least eight times:

1. Pesta 9/4/21 Statement regarding his intelligence research;

CSU Final Report, RE 38, Page ID# 926–927

2. Pesta 9/6/21 Statement regarding report for TCP Project;

CSU Final Report, RE 38, Page ID# 928

3. Pesta 9/7/21 Opening Statement;

CSU Final Report, RE 38, Page ID# 820

4. Pesta 9/7/21 interview;

CSU Final Report, RE 38, Page ID# 821–845

5. Pesta 10/11/21 interview;

CSU Final Report, RE 38, Page ID# 883–924

6. Pesta 10/11/21 response to testimony of non-NIH Complainants;

CSU Final Report, RE 38, Page ID# 879–882

7. Pesta 10/18/21 written interview supplement; and

CSU Final Report, RE 38, Page ID# 928

8. Pesta rebuttal to the Draft Report of the Committee.

CSU Final Report, RE 38, Page ID# 946–956.

Pesta's attorney was able to participate fully in the Pesta interviews and to participate as he requested during the investigation. During his first interview, Pesta made several admissions. First, he admitted that he failed to correctly report the Global Ancestry Paper:

> I had three applications for the same data, but I was screwed up and I reported the [GlobalAncestry] paper in the one application that didn't mention intelligence, and so I think a lot of the issues arise from that.

CSU Final Report, RE 38, Page ID# 828.

Second, he admitted that he uploaded the TCP data to an external website without the permission of NIH:

. . And I apologize, I admit that I should have reported it in the first application, but it didn't occur to me. It was an oversight, and I didn't realize that was an issue until what, two years later, when Bird complained?

CSU Final Report, RE 38, Page ID# 330

Third, he admitted that he did not tell CSU about where he was going to store the data:

> Okay I'm glad you asked that. Because initially, in the application it said I was going to run it on a CSU computer, and we started to do that. I had a CSU laptop, my laptop. But it wasn't powerful enough to process the data, so we bought a standalone desktop

CSU Final Report, RE 38, Page ID# 833

Fourth, he admitted that his research assistant Fuerst had "gone rogue":

> Yeah, so I don't want to make it seem like John is the problem, and everything is John's fault, because I've made mistakes. But he's sort of gone a little bit rogue, and I suspect there's no way he would talk to any CSU people, but I could ask.

CSU Final Report, RE 38, Page ID# 835, 843.

Fifth, he admitted that he wished he had been more clear with NIH about the purposes for requesting the data:

> But what specifically if I hypothetically were to do it again? I would have paid more attention to the applications. I would

have reported the website that I wanted to upload data to. I
would have been absolutely crystal clear that I was interested
in, not only in, but that I was interested in looking at intelli-
gence as a variable.

CSU Final Report, RE 38, Page ID# 836

Pesta also told the Investigation Committee regarding Fuerst, "Yeah,
I suspect [Fuerst's] gonna try to publish data, even though the NIH says
don't." CSU Final Report, RE 38, Page ID# 843. When asked whether
publishing without permission would be a serious violation, Pesta said,
"I would think that it's an extremely serious violation. I think it would
lead to, ultimately, retraction. That's part of why I pulled out is, the NIH
said you can't have the data. And if you can't have the data, you can't
have the data." CSU Final Report, RE 38, Page ID# 843. So, Pesta giving
the TCP data to Fuerst allowed for all of Fuerst's subsequent refusals
and wrongful conduct.

During the second interview Pesta had with the Investigative Com-
mittee, Pesta acknowledged that he did not disclose to the NIH that he
would be imputing the phenotype information in his Data Requests. CSU
Final Report, RE 38, Page ID# 886. Pesta also explained why he believed
Fuerst may still have the data, saying, "Well, I think his life's mission is
to get his research published." CSU Final Report, RE 38, Page ID# 893.
Pesta admitted that he was uncertain of Fuerst's motives and actions
and that Fuerst was unwilling to work with CSU or testify before the

Investigative Committee. Despite this, Pesta admitted that he was still working with Fuerst to publish papers. CSU Final Report, RE 38, Page ID# 901.

During the second interview, the Investigative Committee asked about the Human Phenome Diversity Foundation ("HPDF"). HPDF is a private foundation started by Pesta and Fuerst to solicit donations to "support researchers who want to research this area" and "to help [Fuerst] further his education." Pesta Deposition, RE 38, Page ID# 718. Pesta acknowledged that he and Fuerst used funds from HPDF to re-imburse themselves for the purpose of buying the computer they used at Pesta's home, the food they ate while they were working, Uber rides for Fuerst, and perhaps Fuerst's tuition. Pesta Deposition, RE 38, Pages ID# 719–720. The tax returns for HPDF show that it took in more than $21,470 in 2019 and $65,395 in 2021. Summary Judgment Exhibits 7 and 8, RE 47, Page ID# 1633–1645 and 1647–1662.

The documents produced by HPDF's bank show that HPDF paid $8,054 in computer expenses and more than $2,000 in Uber or Lyft ex-penses. Summary Judgment Exhibit 9, RE 47, Page ID# 1664–1737. CSU's conflict of interest policies require disclosure of any conflict of in-terest valued at greater than $5,000. OAC Sec. 3344–02–04.

On December 2, 2021, the Investigative Committee provided Pesta its draft report finding that Pesta had engaged in research misconduct and allowed Pesta to submit a rebuttal before the report went to the decision

maker – the Provost. CSU Final Report, RE 38, Page ID# 946–956. On January 13, 2022, the Investigative Committee issued its CSU Final Report finding by clear and convincing evidence that Pesta had intentionally, knowingly, or recklessly committed research misconduct by (1) the unauthorized use of controlled-access data, (2) violating the non-transferability terms of the NIH agreement, (3) publishing a paper without the permission of NIH, (4) failing to submit his proposed research to CSU's IRB for exemption or approval, and (5) failing to disclose outside funding for the research. The Investigation Committee also called into question Pesta's receipt of funds from HPDF and his collaboration with Fuerst. CSU Final Report, RE 38, Page ID# 795–804.

Thereafter, Provost Bloomberg reviewed the CSU Final Report as well as Pesta's rebuttal and issued her recommendation of termination. CSU Final Report, RE 38, Page ID# 957–964. She agreed with the Investigation Committee's findings of fact and observed that:

> The NIH has noted these sanctions and identifies both you and, by extension, Cleveland State University, as being in violation of their policies. This, of course, has serious implications for our research reputation and success as a university.

CSU Final Report, RE 38, Page ID# 957–964. Provost Bloomberg found that Pesta had violated CSU's statement on Professional Ethics and Academic Responsibility, including the following:

Responsibility to scholarship: The faculty member has the responsibility of being unfailingly honest in research and teaching, refraining from deliberate distortion or misrepresentation and taking regular precautions against the common causes of error.

Provost Bloomberg noted her concern about Pesta's professional relationship with Fuerst and the nondisclosure of external funds (the HPDF funds) used for CSU-affiliated research purposes. She wrote, "In both of these areas I find that you fail to understand or acknowledge the gravity of your responsibilities as a tenured full professor as it relates to the conduct of research." CSU Final Report, RE 38, Page ID# 957–964. In deciding that dismissal was proper, Provost Bloomberg wrote "Given the seriousness of this research misconduct case and the fact that the harm extends beyond your personal reputation to taint the reputation of CSU as a whole, I find the offense warrants the most serious sanction be administered and that any lesser sanction would be disproportionate to the gravity of your conduct." CSU Final Report, RE 38, Page ID# 957–964.

Article 8 of the Collective Bargaining Agreement between CSU and the AAUP ("Agreement") defines the process for sanction and dismissal of a faculty member. Motion for Summary Judgment Exhibit 1, RE 47, Page ID# 1604–1605 and 1606–1609. The Agreement calls for the creation of an Ad Hoc Committee consisting of three bargaining unit members and three members of the academic administration. The Ad Hoc Committee in this case held a hearing on January 28, 2022, at which

time Pesta was invited to appear and present his evidence. Pesta Deposition Exhibit 23, RE 38, Page ID# 1105–1107. Pesta gave a PowerPoint presentation to the Ad Hoc Committee. Pesta Deposition Exhibit 21, RE 38, Page ID# 1093–1102. Pesta also provided a written response. Pesta Deposition Exhibit 22, RE 38, Page ID# 1103–1104. On February 28, 2022, the Ad Hoc Committee unanimously determined that Pesta's termination was warranted. Pesta Deposition Exhibit 23, RE 38, Page ID# 1105–1107. It specifically considered Pesta's contention that his academic freedom had been infringed. The Ad Hoc Committee wrote, "The 6 ad-hoc committee members were in unanimous agreement that any conclusions should be (and were) arrived at irrespective of the content of Dr. Pesta's research." Pesta Deposition Exhibit 23, RE 38, Page ID# 1107. Provost Bloomberg informed Pesta of the final decision to dismiss him of February 28, 2022. Pesta Deposition Exhibit 24, RE 38, Page ID# 1108–1109.

### G. Post Termination Confirmation of Pesta's Research Misconduct.

Pesta requested that the AAUP grieve or appeal the termination decision. The AAUP denied the request in a thorough analysis that concluded, "Given the level of due process that Dr. Pesta had throughout the process, his failure to rebut the charges, the seriousness of the charges, and the overwhelming evidence against him, the Executive Committee

[of the AAUP] determined that, on the merits, they would not be successful in arbitration." The AAUP also saw no procedural errors in connection with the handling of Pesta's case. Pesta Deposition Exhibit 26, RE 38, Page ID# 1124–1144.

Pesta subsequently filed an unfair labor practice charge with the State Employee Relations Board ("SERB") against the AAUP claiming it had failed to represent him in connection with his termination. Again, Pesta was represented by counsel in connection with his SERB charge. Pesta Deposition Exhibit 25, RE 38, Page ID# 1110–1111. SERB dismissed the charge on June 30, 2022 saying the charge was being dismissed for lack of probable cause to believe the statute had been violated. Pesta Deposition Exhibit 30, RE 38, Page ID# 1160–1161.

## SUMMARY OF THE ARGUMENT

This case is about a professor who was terminated for serious research misconduct. Pesta mischaracterizes this as a case about academic censorship. Pesta's Brief is a politically charged read but contains virtually no discussion of the applicable Sixth Circuit case law on what speech is protected and the standard a plaintiff must meet to satisfy the causation element in First Amendment retaliation claims such as this one. And for good reason, the law indisputably supports the District Court's decision to grant summary judgment.

Pesta's brief principally argues that the District Court erred in applying *Garcetti v. Ceballos*, 547 U.S. 410 [126 S. Ct. 1951, 164 L. Ed.2d 689] (2006), instead of the balancing test from *Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205*, 391 U.S. 563 [88 S. Ct. 1731, 20 L. Ed. 2d 811] (1968) in determining the speech at issue was not entitled to First Amendment protection. In doing so, Pesta ignores that the District Court granted summary judgment because it found "Pesta was not fired because he exercised his right to free speech under the First Amendment," but rather "was fired due to his misconduct in accessing NIH data." Opinion, RE 73, Page ID# 3972. The District Court's subsequent application of *Garcetti*, even if error, is not reversible, because there is no evidence that the speech was a substantial and motivating factor in Pesta's termination. Indeed, the record demonstrates Pesta would have been terminated for research misconduct regardless of the content of his Global Ancestry Paper. Thus, Pesta cannot sustain a First Amendment retaliation claim as a matter of law.

Further, the District Court's decision should also be affirmed because the Individual Defendants have qualified immunity from this suit. The Individual Defendants took action in this case only as employees of CSU but were sued in their individual capacity.[2] The evidence does not support a finding that they violated any of Pesta's constitutional rights when they issued a report finding he engaged in serious research misconduct,

---

[2]    Provost Laura Bloomberg was also sued in her official capacity.

let alone that they knowingly violated any "clearly established" right, as is required to impose liability on individual government officials. Importantly, aside from Provost Bloomberg, the Individual Defendants, were not the decision-makers with the authority to terminate Pesta and, as such, are immune from liability.

Finally, the District Court correctly dismissed the declaratory judgment count because it failed to set forth a case or controversy. While Pesta's Brief asserts that the dismissal of declaratory judgment count should be reversed, it offers no argument that the finding of no case or controversy is reversible error. Thus, Pesta has waived any such argument for the purposes of this appeal.

## ARGUMENT

### I.  THE STANDARD OF REVIEW IS DE NOVO.

An appellate court reviews the District Court's summary judgment rulings de novo. *Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017). Summary judgment is appropriate when, as here, there is no genuine issue of material fact to be tried and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–249 [106 S. Ct. 2505, 2510] (1986).

## II. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT DISMISSING PESTA'S FIRST AMENDMENT RETALIATION CLAIMS BECAUSE PESTA WAS FIRED FOR RESEARCH MISCONDUCT AND NOT IN RETALIATION FOR PROTECTED SPEECH.

To state a claim for First Amendment retaliation, the plaintiff must show: "(1) that the speech was protected by the First Amendment; (2) [that he or she] suffered an adverse employment action; and (3) [that] the adverse action was motivated at least in part in response to the exercise of [his or her] constitutional rights." *Nailon v. Univ. of Cincinnati*, 715 F. App'x 509, 513–514 (6th Cir. 2017) (citing *Savage v. Gee*, 665 F.3d 732, 738 (6th Cir. 2012)). There is no dispute that Pesta suffered an adverse employment action. He was terminated. However, as the District Court correctly concluded, Pesta cannot as a matter of law establish the first and third elements that the speech was protected and that the adverse action was motivated at least in part in response to the exercise of Pesta's constitutional rights because the evidence overwhelmingly demonstrates Pesta was fired for research misconduct and not the content of the Global Ancestry Paper.

### A. Pesta, as a Public Employee, Has No First Amendment Protection for Speech that Relates to his Inaccurate, Dishonest or Incomplete Statements to the NIH Pursuant to his Official Duties.

The threshold inquiry in a First Amendment retaliation case is to determine the nature of the speech at issue. *Kennedy v Bremerton Sch. Dist.*, 597 U.S. 507, 142 S.Ct. 2407, 2423 (2022). When a public employee speaks "pursuant to [his or her] official duties," the employee does not speak as a citizen, but rather as the government—it is the government's own speech. *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. at 421.) Here, when Pesta was requesting access to and reporting about his use of the Controlled Access Data to the NIH, he was acting as a representative of CSU. Indeed, absent his association with CSU neither he nor his coauthors would have been permitted access to the data by NIH. Clearly, Pesta's speech requesting access to the data and reporting to the NIH about the data comes within the purview of Pesta's official duties and is not speech by a private citizen. This is true without regard to the subject matter of the underlying research. Moreover, because Pesta was not accurate or truthful with the NIH about how he was going to use the data, CSU's reputation as a research institution was compromised. Moreover, even assuming such speech is somehow protected, CSU has a strong and supportable countervailing interest in rejecting faculty attempts to make knowingly or recklessly false statements to research entities such as the NIH. See e.g., *Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205*, 391 U.S.

at 574, 88 S.Ct. 1731, 1738, 20 L.Ed.2d 811. The District Court correctly determined that Pesta's false and evasive Data Requests and reporting to the NIH is not, and should not be, protected speech under the First Amendment.

    **B.  The District Court Correctly Determined There is no Genuine Dispute of Material Fact that Speech (the Global Ancestry Paper) was NOT a Proximate Cause of Pesta's Termination.**

   A First Amendment retaliation case cannot proceed as a matter of law where a plaintiff, like Pesta, cannot establish causation. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 [121 S.Ct. 1508, 149 L.Ed.2d 509] (2001). A plaintiff's burden in demonstrating causation is not "trivial" and "the analysis of motive in retaliation claims utilizes a shifting burden that may mean early dismissal." *Thaddeus–X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999). Causation requires the plaintiff to show the protected speech was a "substantial" or "motivating" factor behind the adverse employment action. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 [97 S.Ct. 568, 50 L.Ed.2d 471] (1977). If the plaintiff succeeds in proving that First Amendment activity was a substantial or motivating factor, the defendant-employer still prevails if by a preponderance of the evidence it demonstrates that it would have

reached the same adverse employment decision "even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, at 287.

## C. The Content of the Global Ancestry Paper was <u>NOT</u> a Substantial or Motivating Factor Behind Pesta's Termination

This Court has previously characterized a motivating factor as "one without which the action being challenged simply would not have been taken." *Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010) (citing *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002)). Thus, in this Circuit, courts analyze a "motivating factor" as "but-for causation." *Sensabaugh v. Halliburton*, 937 F.3d 621, 629 (6th Cir. 2019) (citing *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007)).

In order to show causation, the plaintiff must "point to specific, non-conclusory allegations reasonably linking [his] speech to [the adverse action]." *Rodgers v Banks*, 344 F.3d 587, 602 (6th Cir. 2003). Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. *Nguyen v City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Here, there is no claim, let alone any evidence, of disparate treatment. Likewise, a retaliatory inference cannot be drawn from temporal proximity as almost two years passed between the publication of the Global Ancestry Paper and CSU's investigation into Pesta's research conduct. *Nguyen v City of Cleveland*, 229 F.3d at 566–67. ("[P]revious cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months.") (internal quotation omitted).

### 1. There is no temporal proximity.

While temporal proximity alone is rarely sufficient to establish causation, a total "lack of temporal proximity" as is the case here, can be "fatal" to a plaintiff's claim. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 676 (6th Cir. 2013)(affirming summary judgment for the employer on retaliation claim where there was a two-year gap between the allegedly protected activity and the first alleged retaliatory act); *see also*, *Breeden*, 532 U.S. at 273–74 (holding that an adverse "[a]ction taken (as here) 20 months later suggests, by itself, no causality at all"); *Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007) (noting that the plaintiff was unable to "point to any authority holding that a causal connection exists where there has been a gap of multiple years . . . between the protected activity and the adverse employment action").

## 2. There is a legitimate intervening non-retaliatory reason for the termination.

Even where temporal proximity exists, this Court has held when there is "'an intervening legitimate reason' to take an adverse employment action [it] 'dispels an inference of retaliation.'" *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 628 (6th Cir. 2013) Where, like here, the intervening legitimate reason is a formal third-party complaint, i.e., the findings of the NIH, summary judgment for failure to establish causation is appropriate. *See*, *e.g. Ruiz-Fane v. Tharp*, 545 F. Supp. 3d 543, 558 (N.D. Ohio 2021) (granting summary judgment on a retaliation claim because causation is not satisfied where the employer commenced an investigation seven months after the alleged protected activities in response to formal third-party complaints).

In *Kuhn*, this Court affirmed summary judgment in favor of an employer where the plaintiff was terminated shortly after engaging in a protected activity because the plaintiff could not establish causation as a matter of law. *Kuhn v. Washtenaw Cnty.*, 709 F.3d at 628. The plaintiff failed to return to work after discretionary leave ended leaving his employer short-handed. He was subsequently terminated. This Court found no error in the district court's dismissal of his retaliation claim, reasoning the failure to return to work was a legitimate intervening reason to terminate the plaintiff despite the temporal proximity. *Id.* Similarly, in

*Ruiz-Fane*, the court reasoned that a formal third-party complaint "undermines plaintiff's [retaliation] argument" as the employer was "merely following its own protocol." *Ruiz-Fane v. Tharp*, 545 F. Supp. 3d at 558.

Here, like in *Fuhr*, approximately two years passed between Pesta's publication in August of 2019 and the commencement of CSU's investigation into Pesta's research misconduct in July 2021. While this two-year gap alone should be "fatal" to Pesta's claim, CSU actually knew that Pesta was researching and publishing articles on the correlation between race/ancestry and intelligence – the controversial subject of his Global Ancestry Paper – well *before* 2019 and never took any adverse actions against him. In fact, CSU had been aware of Pesta's research interests involving intelligence and race/ancestry for more than a dozen years before his termination. During that time, CSU awarded Pesta tenure and promoted him to Full Professor based in part on his research. CSU even gave him a sabbatical to research and write the very paper he now claims is the reason for his termination. Therefore, the timeline demonstrates that Pesta's research interests were not a motivating factor in his termination because he had received tenure and a promotion *after* Pesta began engaging in this research and was employed for two more years after the publication of his Global Ancestry Paper without receiving any adverse employment action.

Further, the NIH findings constitute a "legitimate intervening reason" for CSU's investigation and termination of Pesta. Like the employer

in *Ruiz-Fane*, CSU was following its own protocol by investigating a formal complaint of research misconduct against Pesta. Complaints by outsiders, including the NIH, began in September 2019. Critically, there is nothing in the record to suggest that CSU caused the NIH investigation. CSU did not begin its investigation until July 2021, only after the NIH made its findings of wrongdoing by Pesta. The District Court did not err in granting summary judgment here because there is a total lack of temporal proximity and a legitimate intervening reason – NIH findings of misconduct - justifying Pesta's investigation and termination.

### 3.   There is no direct evidence of retaliation.

Here, the most Pesta can show is that some members of CSU's faculty and administration disagreed with his research findings and did not consider these findings a valuable contribution to the body of research on human intelligence. This position ignores the fact that all academic research is controversial, a fact agreed to by Pesta's own expert. Warne Deposition, RE 42, Page ID# 1328–1329. Moreover, all faculty members, including those on the Investigative Committee, have academic freedom to have opinions on the value or validity of academic research.

Pesta also argues in his Brief that Professor Mallett, who was a member of the Investigative Committee, "admitted under oath that the committee did not proceed against Professor Pesta fairly and impartially." Appellate Brief at Page 4. There is no such admission. The question put

to Professor Mallet at the cited deposition page contained a hypothetical predicate with which Professor Mallett ultimately disagreed. Mallet Deposition, RE 57 Page ID# 3091, 3107–3109, 3110–3112. Clearly, Professor Mallett testified that the Investigative Committee's findings were based on Pesta's research misconduct and not on the subject matter of his research. This testimony is consistent with the Investigative Committee's statement in its final report that ". . .the Committee members approached this investigation without regard to the research topics in hand." CSU Final Report RE 38, Page ID# 799.

**D. Summary Judgment Should be Affirmed Because the Evidence Demonstrates that Pesta Would Have Been Terminated for Research Misconduct Regardless of the Content of his Paper.**

Even if a plaintiff succeeds in proving a prima facie case, the defendant-employer may yet prevail by way of affirmative defense if it can prove by a preponderance of the evidence that it "would have reached the same" adverse employment decision "even in the absence of the protected conduct." *Vereecke v Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (citing *Mt. Healthy*, 429 U.S. at at 285). A defendant should prevail at summary judgment if the defendant shows that a reasonable factfinder either would have to reject the plaintiff's claim on the merits or accept defendant's affirmative defense. *See, e.g., Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 207–08 (6th Cir. 2010) (applying *Mt. Healthy* to

44

First Amendment retaliation suit in summary judgment context); *McCue v. Bradstreet*, 807 F.3d 334, 344–47 (1st Cir. 2015) (same). Indeed, this Court has previously affirmed summary judgment in favor of the employers despite the plaintiff establishing a prima facie First Amendment retaliation claim because the employer "'demonstrate[d] by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct.'" *Li v. Jiang*, 673 F. App'x 470, 475 (6th Cir. 2016); *see also*, *Haji v. Columbus City Sch.*, 621 F. App'x 309, 314–15 (6th Cir. 2015) (affirming summary judgment because the employer showed a legitimate nonretaliatory reason for rescinding permitted absences when the plaintiff did not dispute that a supervisor complained about the absences); *Akers v. Cnty. of Bell*, 498 F. App'x 483, 488 (6th Cir. 2012) (affirming summary judgment in part because the plaintiff conceded her inappropriate workplace behavior and the employer therefore showed it would have terminated the plaintiff regardless of her protected speech).

Here, Pesta would have been terminated for research misconduct even absent his speech. The NIH determined that Pesta violated NIH rules not once, but twice. It reaffirmed its decision after affording Pesta an appeal and second opportunity to be heard on the matter. Although CSU was aware that the NIH was in the best position to determine violations of its rules, CSU began its own process to determine whether Pesta had engaged in misconduct and again gave Pesta many opportuni-

ties to be heard on the matter. In that process, Pesta essentially admitted most of the conduct about which the NIH complained, or he failed to provide explanations for his behavior and decisions other than he did not mean to do anything wrong. Of course, this latter contention by Pesta is belied by his communications with his coauthors of the Global Ancestry Paper that they set out to mislead the NIH and to avoid scrutiny by either NIH or CSU at every turn. Pesta's position in this case appears to be that CSU and the Individual Defendants should have ignored the specific findings by the NIH about the use of its own data even though Pesta failed to provide a credible rebuttal to those allegations.

Pesta has failed to produce any evidence whatsoever that his conduct did not amount to misconduct. Indeed, although given an opportunity to do so, Pesta provided no expert opinion that his dealings with the NIH were proper or that his dealings did not amount to misconduct. Essentially, Pesta has offered no evidence to rebut the Individual Defendants' contention that Pesta would have been fired for his conduct without regard to the subject matter of his research.

Instead of showing he did not commit research misconduct or that his conduct was not so substantial that it warranted dismissal, Pesta attempts to say that the process used by the Investigative Committee deviated from the Ohio Revised Code procedures established by CSU and that those deviations are somehow tantamount to evidence that CSU actually acted not based on Pesta's serious misconduct but instead on the

subject matter of his research. This argument totally ignores the fact that the Ohio Administrative Code allows CSU to deviate from those procedures. See Ohio Admin. Code section 3344–28–01(A) and (C). It also ignores the undisputed factual record that Pesta was given multiple and substantial opportunities to make his case and present his evidence to the Investigative Committee. This is not a situation where Pesta was not heard or given an opportunity to see and counter the evidence against him. Despite multiple opportunities to present his arguments, the facts demonstrated that Pesta engaged in research misconduct of such a nature that dismissal was supported. Clearly, a reasonable factfinder could only determine that Pesta would have been terminated for his misconduct regardless of the subject matter of his research. Accordingly, summary judgment was appropriate.

### E. The District Court did not Err and Fail to Conduct its Own Review of the Record.

Ignoring the timeline and well-established case law on retaliation claims in the Sixth Circuit, Pesta argues that the District Court failed to conduct its own review of the record. Pesta claims "the lower court's utter failure to conduct its own review of the findings of research misconduct" is reversible error. Appellant's Brief at 37. This argument is both factually and legally flawed.

First, there is no basis for asserting the District Court failed to review the administrative record and consider Pesta's unconvincing arguments. The District Court did not, anywhere in the opinion, indicate that it was deferring to CSU's or the NIH's judgment. Opinion, RE 73. To the contrary, the District Court's Opinion discusses its consideration of Pesta's arguments at length. *Id.*, at Page ID# 3971–74. Thus, the District Court's opinion clearly demonstrates its consideration of both the arguments Pesta advanced and the facts before it. Pesta attacks the District Court's review of the record, not because there is evidence the District Court ignored the record, but because he does not agree with the District Court's conclusion.

Pesta's argument is not only factually lacking, it is also legally flawed. Contrary to Pesta's assertion, where a case arises from an academic context at a university, as this one does, "judicial intervention in any form should be undertaken only with the greatest reluctance." *Doherty v. S. Coll. Of Optometry*, 862 F.2d 570, 576 (6th Cir. 1988) *(Doherty)* (citing *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 226, 106 S. Ct. 507, 88 L. Ed.2d 523 (1985) (noting that federal courts are unsuited "to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions")). CSU's termination of Pesta for research misconduct was an academic decision and is, therefore, entitled to a "deferential standard of review." *Doherty*, at 577 (noting a "deferential standard of review for decisions by univer-

sities based upon academic criteria"); *see also Grutter v. Bollinger*, 539
U.S. 306, 328 (2003) (noting "tradition of giving a degree of deference to
a university's academic decisions"); *Bd. Of Curators of Univ. of Mo. V.
Horowitz*, 435 U.S. 78, 92 (1978) ("Courts are particularly ill-equipped to
evaluate academic performance," a fact that "warn[s] against… judicial
intrusion into academic decision-making").

In support of his novel argument, Pesta quotes dicta from an Eleventh
Circuit case - *Holley v. Seminole Cnty. Sch. Dist*, 755 F.2d 1492, 1502
(11th Cir. 1985) - and cites another inapposite case from this Circuit -
*Cir. - Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1046–1047 (6th
Cir. 2001). Appellant's Brief at 37. Pesta conveniently fails to provide
any explanation of either case. Both cases involve the termination of
public-school teachers for behavior; not the termination of a university
professor for research misconduct. *Id.* at 1045; *Holley*, at 1495.

Moreover, Pesta's pin cite to *Cockrel* is a discussion of whether the
teacher's claims were precluded by collateral estoppel because the
teacher did not appeal the Superintendent's decision to terminate her
and does not in any way support Pesta's assertion. *Cockrel*, 270 F.3d at
1046–47; Appellant's Brief at Page 37. At no point does the *Cockrel* Court
state that the academic decisions made by faculty members at public uni-
versities should not be given any deference by courts. *See id.*

Here, unlike in *Holley* and *Cockrel*, a public university professor was
terminated for serious research misconduct. The faculty and administra-

tors at academic institutions are better positioned than courts to evaluate research misconduct and, contrary to Pesta's argument, entitled to some deference from the courts. *See, e.g. Ewing, supra.*; *Gutter supra.*; *Horrowitz, supra.*; *Doherty, supra.*

Regardless, there is no support for Pesta's insinuation that the District Court did not review the administrative record. According to the District Court's own opinion, summary judgment was granted because "the ample record before this Court shows that Pesta was fired because of his own misconduct associated with accessing restricted data from the NIH" and "Pesta has not identified any facts contradicting Defendants' position." Opinion, RE 73, Page ID# 3972–3973.

### F.  The District Court Did Not Err and There is No "After Acquired Evidence".

Pesta also incorrectly argues that the District Court erred by considering evidence of his correspondence with his coauthors that "suggests that the group was trying to cover-up the true reason for accessing the NIH data" because, as argued by Pesta, this is after-acquired evidence that cannot be used as a defense to liability under *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 353 (1995). However, the correspondence is not after-acquired evidence.

After-acquired evidence is evidence acquired after an adverse employment decision has been made that provides ***an independent basis*** to

justify the employment decision. *McKennon*, 513 U.S. at 359–60 (holding employer cannot claim "employee was fired for the nondiscriminatory reason" where the employer had no knowledge of the nondiscriminatory reason at the time of firing); *see also Edgar v. JAC Prods.*, 443 F.3d 501, 512 (6th Cir. 2006) (explaining that *McKennon* prohibits the "use evidence of employee misconduct acquired after discharge as a legitimate, nondiscriminatory reason for the employment decision" as a bar to liability).

In *McKennon*, the plaintiff brought a discrimination suit against her employer after she was terminated as part of a reduction in workforce. *McKennon*, 513 U.S. at 354. The plaintiff alleged she was discriminated against on the basis of her age. *Id.* After the termination, the employer learned that the plaintiff had improperly copied several confidential documents, a terminable offense. *Id.* at 355. The Court held that such evidence could be used at the remedial stage of the proceedings to reduce damages, but it did not foreclose a finding of liability. *Id.* at 360. The *McKennon* Court emphasized "the case comes to us on the express assumption that an unlawful motive was the sole basis for the firing" and reasoned that the unknown evidence of copying confidential documents was not relevant to liability because it could not have been a basis to motivate the termination. *Id.* at 359.

*McKennon*'s reasoning does not apply here. CSU knew that Pesta engaged in research misconduct before terminating him. Indeed, it was the

51

stated basis for his termination. Unlike in *McKennon*, the evidence of Pesta's correspondence with his co-authors confirms that CSU was correct in finding that Pesta engaged in research misconduct. It further illuminates the motivation for Pesta's behavior for which he was terminated. Thus, it was appropriate for the District Court to consider this evidence in connection with causation.

Even if this evidence were not considered at all, summary judgment would still be appropriate because the causation analysis does not change. There is still no direct evidence to support a finding that Pesta was fired for the content of the Global Ancestry Paper. There is still no temporal proximity. And there is still a legitimate intervening nonretaliatory reason for the termination – the NIH finding of research misconduct. Therefore, the District Court did not err in granting summary judgment.

## III. SUMMARY JUDGMENT SHOULD BE AFFIRMED BECAUSE APELLEES HAVE QUALIFIED IMMUNITY.

Even if everything set forth in Pesta's Brief were accepted, the District Court's order should still be affirmed because the Individual Defendants are individuals entitled to qualified immunity. Although the District Court's Opinion does not address qualified immunity, Appellees raised it as a basis for summary judgment below. Motion for Summary Judgment, RE 47, Page ID# 1598–1599.

The Sixth Circuit may affirm the District Court's Opinion "on any grounds supported by the record." *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 569 (6th Cir. 2001); *see also Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.*, 772 F.2d 214, 216 (6th Cir. 1985) ("A decision below must be affirmed if correct for any reason, including a reason not considered by the lower court."). Here, qualified immunity provides this Court with another basis to affirm the District Court's grant of summary judgment.

Qualified immunity is an immunity from suit rather than a mere defense to liability. *Pearson v Callahan*, 555 U.S. 223, 231 (2009). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S. Ct. 2074, 2085 (2011). "When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 337, 106 S. Ct. 1092, 1094 (1986)). Put another way "officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Rudlaff v Gillispie*, 791 F.3d 638, 644 (6th Cir. 2015)(citations omitted).

Under this doctrine, a court may not award damages against a government official in his or her personal capacity when in performing a discretionary function, the government official's "conduct does not violate clearly established statutory or constitutional rights of which a rea-

sonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). The Sixth Circuit recently held, "Overcoming the invocation of qualified immunity requires a plaintiff to . . . show both that (1) officials violated his constitutional rights, and (2) that the right was clearly established at the time of the challenged conduct." *McElhaney v. Williams*, 81 F.4th 550, 553 (6th Cir. 2023).

Further, individuals who are not final decisionmakers with respect to the adverse employment action are immune and cannot be held liable for the actions of the final decisionmaker, even in the retaliation context. *See e.g.*, *Yerkes v. Ohio State Highway Patrol*, 22–3030, 2022 U.S. App. LEXIS 35260, at *18 (6th Cir. Dec. 19, 2022)) (holding non-decisionmakers are entitled to qualified immunity, citing several First Amendment retaliation cases in Sixth Circuit holding the same). Indeed, this Court has repeatedly held individuals lacking the authority to terminate a plaintiff cannot be held liable for retaliatory discharge. *See Yerkes v. Ohio State Highway Patrol*, at *18; *Fritz v. Charter Twp. of Comstock*, 463 F. App'x 493, 500 (6th Cir. 2012) (no liability where defendant "was not in a position to terminate Plaintiff . . . and lacked authority to take adverse action against her"); *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001) ("[The defendant's] comments do not demonstrate a causal connection between [the plaintiff's] filing of grievances and the [adverse action] because it is uncontroverted that she was not the decisionmaker in this case."); *Shehee v. Luttrell*, 199 F.3d 295, 301 (6th

Cir. 1999) ("The defect in [the plaintiff's] claim is that neither [of the defendants] were involved in his firing, the alleged adverse action. Despite [the plaintiff's] contention that [the defendants] instigated his firing, these men did not have the ability to terminate [the plaintiff] from his commissary position.").

Here, Pesta had no constitutional right to violate the Data Use Agreements with the NIH or to violate CSU policies. The Individual Defendants reasonably believed that Pesta's conduct with the NIH and CSU was research misconduct and they had no reason to believe that they were violating any constitutional right by finding such misconduct. Moreover, the members of the Investigative Committee and Dr. Ward, exercised no discretion in making their findings. They made no recommendation as to what should happen to Pesta as a result of their findings. As such, they enjoy qualified immunity. They not only exercised no discretion, but they were also not decision makers and cannot be held liable as decision-makers. Accordingly, the Individual Defendants are entitled to qualified immunity here and summary judgment should be affirmed.

## IV. THE DISTRICT COURT CORRECTLY DISMISSED THE DECLARATORY JUDGMENT COUNT BECAUSE IT FAILS TO SET FORTH A CASE OR CONTROVERSY.

Ignoring the District Court's reasoning for dismissing the declaratory judgment count, Pesta argues it was improperly dismissed because Appellees only argued it was derivative of the other counts and the District Court erred in dismissing those other counts. Appellant's Brief at 54. However, the District Court expressly held it dismissed the count for declaratory judgment because it "failed to set forth a case or controversy." Opinion, R. 73, Page ID # 3975.

Under the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court must be faced with a "case of actual controversy" before granting declaratory relief. Id. The Sixth Circuit interprets this in line with the Article III case or controversy requirement. *TCI/TKR Cable v. Johnson*, 30 F. App'x 581, 583 (6th Cir. 2002) (citing *Brennan v. Rhodes*, 423 F.2d 706, –07 (6th Cir. 1970)).

In dismissing the count, the District Court explained that the declarations sought would be no more than "advisory opinions" and Pesta lacks standing to seek them: "[t]here would be absolutely no reason for this Court to issue opinions" on the subjects raised in this count because "Pesta is no longer an employee of CSU." Opinion, R. 73, Page ID # 3975.

Fatally, Pesta's Brief offers no argument as to why he has standing or why the finding of no case or controversy is reversible error. It is well-set-

tled that "an 'appellant abandons all issues not raised and argued in its initial brief on appeal.'" *J. B-K. by E.B. v. Sec'y of Ky. Cabinet for Health & Fam. Servs.*, 48 F.4th 721, 730 (6th Cir. 2022) (citation omitted). Thus, by not raising this issue in his initial brief, Pesta has abandoned any challenge to the District Court's dismissal of the declaratory judgment count for failure to set forth a case or controversy in this appeal. Accordingly, the dismissal of that count should be affirmed.

## CONCLUSION

For these reasons, Appellees request this Court affirm the District Court's order granting summary judgment in their favor.

Perez Morris

Respectfully submitted,

Dated: March 7, 2025        By: /s/ Karen Giffen _____

*Attorney for*
*Defendants - Appellees*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **12,828 words**, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, **14-pt Century Schoolbook**, using TypeLaw.com's legal text editor.

Dated: March 7, 2025          By: /s/ Karen Giffen _____

## Certificate of Service

I hereby certify that I electronically filed the foregoing **APPELLEE'S BRIEF** with the Clerk of the Court by using the Appellate CM/ECF system on **March 7, 2025**. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Perez Morris

Respectfully submitted,

Dated: March 7, 2025

By: /s/ Karen Giffen

*Attorney for*
*Defendants - Appellees*

**ADDENDUM**

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

| Docket Entry No. | Description | Page ID No. |
|---|---|---|
| 9 | Order Granting Motion to Dismiss | 146-163 |
| 18 | Amended Complaint | 297-329 |
| 28 | Order Granting Motion for Judgment on the Pleadings | 609-615 |
| 38 | Pesta Deposition | 195; 198; 665=691; 672-674; ; 683; 687-688; 690-692; 697; 702; 706; 708; 718; 719-722; 725-726; 732; 735 |
| 38-1 | Pesta CV | 743 |
| 38-3 | Global Ancestry paper | 752 |
| 38-4 | Sabbatical documentation | 781-787 |
| 38-5 | CSU Final Report | 795-804; 806-817; 820-924; 926-928; 935; 946-964 |
| 38-7 | Project Request 18007 | 966-980 |
| 38-9 | Project Request 19090 | 990-1001 |
| 38-10 | Pesta's Timeline | 1002-1003 |
| 38-11 | Project Renewal Request | 1004-1018 |
| 38-12 | Project Request 19747 | 1019-1029 |
| 38-13 | Project Renewal Request | 1030-1044 |
| 38-14 | Project Renewal Request | 1045-1047 |
| 38-15 | Email String | 1048-1053 |
| 38-16 | Email String | 1054-1055 |
| 38-22 | Pesta Position Statement | 1103-1104 |
| 38-23 | Pesta Position Statement | 1105-1107 |
| 38-24 | Provost Letter | 1108-1109 |

| 38-25 | ULP Charge | 1110-1111 |
|---|---|---|
| 38-26 | AAUP Letter | 1124-1144 |
| 38-30 | Dismissal of ULP Charge | 1160-1161 |
| 38-35 | Email String | 1212-1216 |
| 38-38 | Email String | 1225-1226 |
| 42 | Warne Deposition | 1328-1329 |
| 42-12 | Email String | 1445-1457 |
| 44 | Pesta's Motion for Summary Judgment | 1460-1503 |
| 47 | Defendants' Motion for Summary Judgment | 1559-1601 |
| 47-1 | Bloomberg Affidavit | 1604-1609 |
| 47-4 | Email String | 1616-1622 |
| 47-5 | Email String | 1623-1627 |
| 47-7 | Tax Return | 1633-1645 |
| 47-8 | Tax Return | 1647-1662 |
| 47-9 | Bank Records | 1664-1737 |
| 50 | Defendants' Brief in Opposition to Pesta's Motion for Summary Judgment | 1748-1772 |
| 50-1 | Oakes Report | 1813-1852 |
| 56 | Ward Deposition | 2991 |
| 57 | Mallet Deposition | 3091; 3107-3109; 3110-3112 |
| 64 | Pesta's Brief in Opposition to Defendants' Motion for Summary Judgment | 3809-3848 |
| 68 | Pesta's Reply in Support of Summary Judgment | 3881-3913 |
| 71 | Defendants' Reply in Support of Summary Judgment | 3951-3962 |
| 73 | Opinion Granting Summary Judgment | 3963-3975 |
| 74 | Judgment Entry Granting Summary Judgment | 3976 |

Perez Morris

Respectfully Submitted,

By: /s/ Karen Giffen

*Attorney for Defendants - Appellees*

Dated: March 7, 2025